# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALI ALEXANDER
a/k/a Ali Akbar
5801 Golden Triangle Blvd.
Suite #103, #255
Fort Worth, Texas 76244

      and

CHRISTINE TORRE
282 Poplar Trail
Dawsonville GA 30534

      and

JOHN DOE,[1]
c/o Undersigned counsel

                  Plaintiffs,

      v.

NANCY PELOSI, in her official
capacity as Speaker of the United States
House of Representatives.
Office of the Speaker.
The U.S. Capitol. Suite H-232,
U.S. House of Representatives
Washington, D.C. 20515
Telephone:  (202) 225-0100

      and

BENNIE G. THOMPSON, in his official
capacity as Chair of the Select Committee
to Investigate the January 6th Attack on the
United States Capitol.
Rayburn House Office Building Suite 2466
U.S. House of Representatives
Washington, D.C. 20515
Telephone:  (202) 225-5876

Civil Case No.
      1:21-cv-03308  (CJN)

---

[1] Pending resolution of the February 25, 2022, Motion for Leave to Add Additional Plaintiff Under Pseudonym, Docket Entry #6.

and

ELIZABETH L. CHENEY, in her official
capacity as a member of the United States
House of Representatives.
Cannon House Office Building, Suite 416
U.S. House of Representatives
Washington, D.C. 20515
Telephone:  (202) 225-2311

and

ADAM B. SCHIFF, in his official
capacity as a member of the United States
House of Representatives
Rayburn House Office Building, Suite 2309
U.S. House of Representatives
Washington, D.C. 20515
Telephone:  (202) 225-4176

and

JAMIE B. RASKIN, in his official
capacity as a member of the United States
House of Representatives;
Rayburn House Office Building, Suite 2242
U.S. House of Representatives
Washington, D.C. 20515
Telephone: (202) 225-5341

and

SUSAN E. LOFGREN, in her official
capacity as a member of the United States
House of Representatives
Longworth House Office Building, Suite 1401
U.S. House of Representatives
Washington, D.C. 20515
Telephone:  (202) 225-3072

and

ELAINE G. LURIA, in her official
capacity as a member of the United States
House of Representatives.

Cannon House Office Building, Suite 412
U.S. House of Representatives
Washington, D.C. 20515
Telephone:  (202) 225-4215

   and

PETER R. AGUILAR, in his official
capacity as a member of the United States
House of Representatives
Cannon House Office Building, Suite 109
U.S. House of Representatives
Washington, D.C. 20515
Telephone:  (202) 225-3201

   and

STEPHANIE MURPHY, in her official
capacity as a member of the United States
House of Representatives
Longworth House Office Building, Suite 1710
U.S. House of Representatives
Washington, D.C. 20515
Telephone:  (202) 225-4305

   and

ADAM D. KINZINGER, in his official
capacity as a member of the United States
House of Representatives.
Rayburn House Office Building, Suite 3635
U.S. House of Representatives
Washington, D.C. 20515
Telephone:  (202) 225-3201

   and

SELECT COMMITTEE TO
INVESTIGATE THE JANUARY 6TH
ATTACK ON THE UNITED STATES
CAPITOL
Longworth House Office Building
Washington, DC 20515
Telephone: (202) 225-7800

   and

VERIZON COMMUNICATIONS, INC.
Serve:   General Counsel and Executive
Vice President Craig Silliman
1095 Avenue of the Americas
New York, NY 10036

        and

CELLCO PARTNERSHIP
d/b/a VERIZON WIRELESS
Serve:  General Counsel
ATTN: VSAT
1 Verizon Way
Basking Ridge, New Jersey 07920
Corporate Phone Number: 1-908-559-5490

        Defendants

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AGAINST UNLAWFUL SUBPOENA FOR PLAINTIFFS' TELEPHONE RECORDS**

Plaintiffs Ali Alexander, Christine Torre, and John Doe at all times relevant herein are private citizens.  They sue for declaratory judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure ("FRCP") and 28 U.S.C. §2201, *et seq.*, for an injunction and pursuant to 18 U.S.C. § 2702, against the Congressional Defendants for issuing an unlawful and overbroad subpoena to Defendant Verizon for Plaintiffs' telephone records and against Defendant Verizon to enjoin them from turning over the phone records to the Congressional Defendants in violation of the Stored Communications Act and the First and Fourth Amendments.

## PARTIES

1. **PLAINTIFF ALI ALEXANDER** (hereinafter "Alexander"), born Ali Akbar to a Black mother living in Section 8 housing and an Arab father, Alexander left the family when he

was two-years old, is a political consultant and voting rights activist known for leading the election integrity movement which seeks fair elections and transparent counting of every vote for every voter. Alexander has sponsored hundreds of rallies with millions of participants in all fifty states. Not a single one turned violent.

2. On November 4, 2020, he started "Stop the Steal," a viral movement and peaceful protests across the country to address the concerns of millions of voters about how their votes were counted during an election during a coronavirus pandemic with changing ballot casting and counting standards.

3. Alexander was a VIP guest at the Ellipse rally on January 6, 2021, at which President Donald J. Trump spoke.  Also, Alexander held a permit for a rally at Lot 8 on the North East side of the Capitol Grounds on that same date for a "One Nation Under God" event and prayer rally, one of several on the Capitol Grounds scheduled to take place after the Ellipse rally.

4. On his way to his rally permitted by the U.S. Capitol Police following the Ellipse rally, Alexander witnessed some individuals who had arrived before the Ellipse rally ended and were clashing with police near the Capitol Building on the West side.

5. He stood on the grass and his group begged those within range of his voice to go to the North East part of the Grounds where the rally was permitted and planned.  He and his group went around to the East side of the Capitol only to find protestors not being guided to Lot 8 on the North East portion of the Capitol Grounds. He, again, engaged with law enforcement offering to assist with guiding the crowd away from the Capitol steps and toward his permitted Lot 8 space.

6. Alexander's efforts to help the Capitol Police to deescalate the tension, captured on video,

was in vain. His "One Nation Under God" rally did not take place and he left the Capitol Grounds.

7.  On or about October 7, 2021, Alexander was served with a subpoena by the defendant Select Committee To Investigate The January 6th Attack On The United States Capitol (hereinafter "Select Committee") to produce documents requested, including text messages and emails, and to testify at a deposition.

8.  Over the course of several weeks, Alexander, after considerable expense and countless hours, submitted through counsel hundreds of pages of documents, emails, and texts, to the Select Committee, even though much that was sought was not pertinent to the Committee's legislative purpose or in some cases, subject to privilege. In those cases, Alexander only noted the date and time of the text and the subject matter. He did not identify the sender or the recipient by name nor their telephone number for privacy purposes. Alexander himself has been subject to numerous death threats and harassment.

9.  On December 9, 2021, he appeared before the Select Committee for a deposition that lasted approximately eight hours answering numerous questions and made clear he had no role in any of the violent activity.[2] Indeed, it has been reported that the FBI has concluded there was no coordinated plan to attack the Capitol.[3]

10.  Shortly thereafter, Alexander received a notice from Verizon that the Select Committee had subpoenaed Verizon for nine categories of information associated with Alexander's

[2] See ABC News, *"'Stop the Steal' organizer cooperating with Jan. 6 committee probe, sits for 8-hour interview"* (Dec. 9, 2021). https://abcnews.go.com/US/stop-steal-leader-cooperating-jan-committee-probe-deposition/story?id=81645579

[3] Reuters, *Exclusive-FBI finds scant evidence U.S. Capitol attack was coordinated-sources* (Aug. 10, 2021).  https://www.reuters.com/article/us-usa-capitol-attack-exclusive-idCAKBN2FL10X

personal cell phone number, including IP addresses, devices, billing addresses, account changes, a list of contacts, call session times, and dozens to hundreds of other data points or metadata from November 1, 2020 (three days *before* the election and around five days before the outcome of the election was known) to January 31, 2021 and which did not contain any provision for protection of attorney client privilege Alexander may have with his counsel or other information protected by the First and Fourth Amendments. See Exhibit A.

11. The Verizon notice further stated that "unless Verizon receives a court document challenging the subpoena by December 15, 2021, Verizon is compelled to comply with the subpoena."

12. On December 14, 2021, Alexander, through his counsel, sent Verizon a letter via facsimile and overnight delivery submitting "a court document challenging the subpoena," namely, a copy of the Complaint in *Mark Meadows v. Nancy Pelosi, et al*, No. 21-cv-03217- CJN (D.D.C) (filed December 8, 2021).  See Exhibit B.

13. On December 15, 2021, representatives from Verizon called counsel for Alexander later that afternoon and admitted their letter was ambiguous but stated that they meant to say that Alexander had to provide a court document filed *by him* challenging the subpoena, and agreed to an extension for Alexander to file such a suit or to join an existing one by December 17, 2021.

14. On information and belief, Verizon has sent to over 100 subscribers and is continuing to send to other subscribers, subpoena from the Select Committee similar to the one Alexander received in all material respects and who similarly object to the invasion of their privacy but do not have the resources to file a court action challenging the subpoena's

validity on the grounds that Select Committee is unlawfully constituted and that in any event, the production of cell phone records to the Select Committee violate the Stored Communications Act and the First and Fourth Amendment.

15. Verizon further advised counsel this morning that they would not consider a class action as a valid claim to prevent their turning over Plaintiff's records to the Select Committee, asserting that the customer agreement with Verizon precludes filing a class action.

16. The data sought is not pertinent to the investigation and sweeps up privileged communications between Alexander and clergy, Alexander and people he spiritually counsels, and Alexander and his respective attorneys.

17. **PLAINTIFF CHRISTINE TORRE** at all times relevant herein is a private citizen and a resident of Dawsonville, Georgia.

18. As a frequent conference speaker and consultant on such topics as record keeping, transcripts, college admission, scholarships, and test preparation, Christine enjoys helping other Georgia families successfully through the high school years.

19. Christine is the founder and director of a private high school program offering average students the opportunity to graduate with a high school diploma and an associate of arts degree.  Christine has directed a 75- family co-op for 10 years, she authored an SAT prep book and has organized college fairs.  Her annual Dual Enrollment Expo united hundreds of parents and students with colleges seeking to recruit high school students early.

20. Christine directed a 100+ member homeschool group, Forsyth Christian Home Educators, for two years, then served on the Advisory Board for many years.  Christine founded and served on the board of many homeschool programs including the Mu Xi chapter of the National Homeschool Honor Society, American Heritage Girls/Trail Life USA local

Troop, Cumming Christian Co-op, Forsyth Keepers at Home, FCHE Standardized Testing and numerous STEM related clubs for homeschool students.  Christine has leveraged her education in political science and pre-law to support and educate the Georgia homeschool community on relevant legislative changes.

21. When she and her husband voted early at a polling station for the Presidential General Election and her husband was told that he had already voted, which was not true.  They naturally became concerned about the election integrity of the Georgia voting system.

22. They subsequently met Plaintiff Alexander and offered to help with get-out-the-vote efforts for the special Senate election.

23. Shortly thereafter, they traveled to Washington, D.C. to continue to act as volunteers of Stop the Steal campaign by passing out small signs at the rally on January 5, 2021 at Freedom Plaza and attended the Ellipse rally on January 6, 2021.

24. After the Ellipse rally around 1:00pm, there was confusion as to where to go for the permitted "One Nation Under God" rally at Area 8 on the Capitol Grounds as described in Para. 3 of this Complaint.

25. The Torres proceeded slowly to the Capitol area about an hour later and saw some of the crowd becoming unrestful.  They watched from the terrace level and lawn area of the Capitol and left the area two hours later after singing patriotic songs with the peaceful crowd and went back to their hotel. They did not go into the Capitol Building.

26. On February 14, 2022, Christine received a letter dated February 11, 2022 from Verizon Security Subpoena Compliance informing her that unless they receive a court challenge to the subpoena issued by the January 6th Select Committee for her telephone records and those on her family plan account, that includes her husband, one of her three sons, and one

of her two daughters, they would turn over her phone records.   See Exhibit B.

27. The subpoena seeks nine categories of information associated with Christine's personal cell phone number and those of her family on her family plan, including IP addresses, devices, billing addresses, account changes, a list of contacts, call session times, and dozens to hundreds of other data points or metadata from November 1, 2020 (three days before the election and around five days before the outcome of the election was known and weeks before the Torres even became involved in the Georgia Senate runoff election) to January 31, 2021 and which did not contain any provision for protection of communications Christine has with students and parents as part of her job and as protected by the First and Fourth Amendments and federal law.

28. After consultation with counsel for Verizon and the January 6th Committee, the response date was extended to March 7, 2022.

29. **PLAINTIFF JOHN DOE** is a U.S. Citizen and received a subpoena from Verizon that was similar in all material respects to the ones issued to Plaintiffs Alexander and Torre. As noted in footnote 1, *supra*, his participation as a John Doe is pending resolution of the March 25, 2022, Motion for Leave to Add Additional Plaintiff Under Pseudonym, Docket Entry #6.

30. **DEFENDANT NANCY PELOSI** ("Speaker Pelosi") is a Democrat member of the U.S. House of Representatives and Speaker of the House.

31. **DEFENDANT BENNIE G. THOMPSON** ("Chairman Thompson") is a Democrat member of the U.S. House of Representatives and Chairman of the Select Committee to Investigate the January 6th Attack on the United States Capitol. Subpoenas challenged herein were issued with his authority as Chair.

32. **DEFENDANT ELIZABETH L. CHENEY** is a Republican member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

33. **DEFENDANT ADAM B. SCHIFF** is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

34. **DEFENDANT JAMIE B. RASKIN** is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

35. **DEFENDANT SUSAN E. LOFGREN** is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

36. **DEFENDANT ELAINE G. LURIA** is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol

37. **DEFENDANT PETER R. AGUILAR** is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

38. **DEFENDANT STEPHANIE MURPHY** is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

39. **DEFENDANT ADAM D. KINZINGER** is a Republican member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th

Attack on the United States Capitol.

40. **DEFENDANT SELECT COMMITTEE TO INVESTIGATE THE JANUARY 6TH ATTACK ON THE UNITED STATES CAPITOL** (the "Select Committee") is a select committee created by House Resolution 503 ("H. Res. 503") passed by the U.S. House of Representatives on June 30, 2021.

41. **DEFENDANT VERIZON COMMUNICATIONS, INC**. has been subpoenaed to provide subscriber data about Plaitniffs phone accounts to the Select Committee in its role as providing telecommunications services to its "subscribers" (customers or users).

42. **DEFENDANT CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS** has been subpoenaed to provide subscriber data about Mr. Alexander to the Select Committee in its role as providing telecommunications services to its "subscribers" (customers or users).

## JURISDICTION AND VENUE

43. This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States.

44. This Court has personal jurisdiction over Speaker Pelosi because she sponsored H. Res. 503 and oversaw its passage in the House. She also approved and ratified the issuance of the Verizon Subpoenas from Washington, D.C.

45. This Court has personal jurisdiction over Chairman Thompson because he presides over the Select Committee and issued the Verizon Subpoenas from his office address in Washington, D.C.

46. This court has personal jurisdiction over Elizabeth L. Cheney, Adam B. Schiff, Jamie B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, Adam D. Kinzinger because they serve as members of the Select Committee that issued the Verizon

Subpoenas from Washington, D.C.

47. This Court has personal jurisdiction over the Select Committee because it is located and operates in Washington, D.C. Mr. Alexander was compelled to appear there, in-person, without the option of secure remote video options afforded to Members of the Select Committee, during the pandemic. This caused one of Mr. Alexander's legal counsel not to be afforded an opportunity to accompany him.

48. This Court has personal jurisdiction over the Verizon Defendants because it operates continuously and generally in the District of Columbia, including but not limited to installation and operation of physical technical equipment such as cell towers for the conduct of telecommunication services to subscribers like the Plaintiffs. The Verizon Defendants knew that they might be held to answer in the District of Columbia including but not limited to their business goals and promises of providing telecommunication services to subscribers throughout the country.

49. Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim occurred in Washington, DC.

**COUNT I: THE VERIZON SUBPOENAS WERE NOT VALIDLY ISSUED BY A DULY AUTHORIZED COMMITTEE AND THUS WAS *ULTRA VIRES*.**

50. Plaintiffs reallege all allegations from paras 1-49.

51. The composition of the House Select Committee to Investigate the January 6th Attack on the United States Capitol is governed by Section 2 of H. Res. 503. Section 2(a) states "Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503 117th Cong. (2021).

52. Speaker Pelosi has appointed only nine members to the Select Committee: seven Democrats and two Republicans. None of these members was appointed from the selection of five GOP Congresspersons put forth by Republican Minority Leader Kevin McCarthy.

53. Authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

54. Congress' failure to act in accordance with its own rules is judicially cognizable. *Yellin v. United States*, 374 U.S. 109, 114 (1963). This is particularly significant where a person's fundamental rights are involved.

55. Speaker Pelosi failed to appoint members consistent with the authorizing resolution of the Select Committee. Pelosi has appointed only nine members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a), 117th Cong. (2021).

56. Further, of those nine members Speaker Pelosi has appointed, none of them was appointed after consultation with the minority member, as is required by the authorizing resolution. H. Res. 503 § 2(a), 117th Cong. (2021).

57. Thus, the Select Committee as it currently stands—and stood at the time it issued the Verizon Subpoena in question—has no authority to conduct business because it is not a duly constituted Select Committee. Chairman Thompson's subpoena is invalid and unenforceable.

14

**COUNT II: THE VERIZON SUBPOENAS ARE OVERLY BROAD AND BEYOND THE SCOPE OF THE COMMITTEE'S JURISDICTION.**

58. Plaintiffs reallege all allegations from paras. 1-57.

59. H. Res. 503 was voted along partisan lines and is overly broad, addressing even the coronavirus pandemic, but it is not unlimited in scope. The Verizon Subpoena dates are a violation of the authorizing resolution that created the Select Committee.

60. H. Res. 503 establishes three "functions" of the Select Committee: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the  Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) to "issue a final report to the House containing  such findings, conclusions, and recommendations for corrective measures described in subsection  (c) as it may deem necessary."

61. Subsection (c) of Section 4 describes three categories of "corrective measures":  "changes in law, policy, procedures, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at  American democratic institutions"; (2) "to improve the security posture of the United States  Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic  institutions against violence, domestic terrorism, and domestic violent extremism."

62. In August, the Select Committee demanded records from fifteen different social media companies, including Facebook, Reddit, Twitter, and YouTube. *See* Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol,  Select Committee Demands Records related to January 6th Attack from Social

Media Companies (Aug. 27, 2021). The subpoena directed these companies to produce all internal company policies and actions taken relating to "misinformation" about the 2020 election, efforts to interfere with the 2020 election or electoral results, violent domestic extremists, foreign interference with the 2020 election, and more.

63. The Select Committee has also issued preservation of records orders and subpoena to major banking corporations and telecommunication companies. Witnesses are treated as targets and receive no notice from the Select Committee or many of these services that hundreds of millions of Americans used to participate in both commerce and the marketplace of ideas.

64. The Verizon Subpoenas issued by the Select Committee to the Plaintiffs instructs Verizon to produce subscriber information and mobile phone data associated with the account holder's mobile phone number. See Exhibits A and B. The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata. The mobile phone data requested could include all calls, text messages, and other records of communications associated with that phone number. This data can be used for historic mobile site analysis. The Verizon Subpoenas requested all of the Plaintiffs' personal mobile phone data for three months: from November 1, 2020 and January 31, 20211.

65. Mr. Alexander provided the Select Committee with four different productions of documents, with thousands of records. He provided both responsive documents and volunteered other documents he thought might be relevant to the Select Committee's investigation. These records include over one thousand five hundred (1,500) mobile messages that were routed through his Verizon phone service. Notably, as for text messages

and emails that were not pertinent or subject to privilege, he did not provide the name of the other party to the communication or their phone number. The Select Committee has not challenged that privilege log.

66. On November 24, 2021, Mr. Alexander provided the Select Committee with over one thousand and five hundred (1,500) mobile messages sent and received by him and people he corresponded with. All of these were using his Verizon phone service. Mr. Alexander expressed his concerns to the Select Committee about compromising the privacy rights of uninterested parties, and members of political group(s), and productions that exceeded the scope of H. Res. 503.

67. More importantly, Alexander provided the Select Committee with a privilege log of his text messages noting where the subject matter of the text was not pertinent to the Committee's scope of inquiry or otherwise privileged but did not identify the party or the phone number of the sender or recipient of the text unless it was Mr. Alexander.

68. The Committee has not challenged the validity of these privilege logs but the subpoena for his records, if enforced, would reveal those phone numbers that can easily identify the name of the person with that cell phone number, and hence, lead to harassment of those individuals by the Committee with additional subpoena to testify or produce records.

69. The breadth and invasiveness of the Verizon Subpoenas also gave the appearance of a criminal investigation, not a legislative fact-finding mission. It seeks private data used to track an individual person's communications and location, information that would bear on an investigation into that individual, not on potential legislation to be passed by Congress. It also requests this data for a period more than two months prior to January 6, and indeed *several days before the November 3 election*, the ostensible focus of the Select

Committee's supposed legislative recommendations and, with respect to Plaintiff Torre, well before her involvement as a volunteer with Stop the Steal.

### COUNT III: THE VERIZON SUBPOENAS VIOLATE THE FOURTH AMENDMENT AND THE STORED COMMUNICATIONS ACT

70. Plaintiffs reallege all allegations from paras. 1-69.

71. The Verizon Subpoenas instruct Verizon to produce subscriber information and mobile phone data associated with the phone number(s) used by the Plaintiffs and those on their account..

72. The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, session times, and other metadata.

73. The mobile phone data requested includes all calls, text messages, and other records of communications associated with that phone number.

74. This data can be used for historic mobile site analysis.

75. The requested data arbitrarily covers three full months: November 1, 2020 through January 31, 2021.

76. Mr. Alexander produced, to the Select Committee, on four separate occasions, content from this mobile phone that was responsive to his October 7, 2021 subpoena. He has been exceedingly compliant with specific requests and described his process to fulfilling general requests.

77. Mr. Alexander has a reasonable expectation of privacy in his personal mobile phone and data. He remains a private citizen who has never served in government. He has reasonable expectations of privacy and under no required record keeping regulations like government

officials or government employees.

78. The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects.  It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967).

79. The fact that a third party at least temporarily stores a person's mobile phone data does  not alter his expectation or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

80. The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoena untethered from any valid legislative purpose. See *Oklahoma Press Pub. Co.  v. Walling*, 327 U.S. 186, 196 (1946).

81. If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law. None of the Plaintiffs have provided their consent for Verizon to produce their mobile phone data to the Select Committee. And for the reasons discussed *infra*, the Select Committee's subpoena is invalid.

82. A congressional subpoena must be reasonable. An all-encompassing subpoena for personal, nonofficial documents falls outside the scope of Congress' legitimate legislative power.  See *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2040 (2020).

83. The Select Committee's subpoena to both Verizon and Mr. Alexander are so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee. *See McPhaul v. United States*, 364 U.S. 372, 381 (1960). The subpoenas to Verizon, in particular, contains no limitations seeking to preserve applicable privileges or prevent

violations of constitutional rights.

84. For the Select Committee to subpoena Verizon for all of Plaintiffs' personal mobile phone
data over the course of three months is entirely unreasonable. Such a request is so broad
both temporally and with respect to the collected data, that the Select Committee exceeds
any lawfully authorized purpose.  These subpoenas are overbroad on their face and as
applied.

85. As the subpoenas in question exceed the lawfully authorized purpose of the Select
Committee, full compliance with such subpoena would violate Plaintiffs' Fourth
Amendment protection against unlawful search and seizure. The subpoenas are thus invalid
and unenforceable.

86. The subpoenas violate 18 U.S.C. § 1039(b) (making it a crime to transfer 'confidential
phone records information . . . without prior authorization from the customer to whom
such confidential phone records information relates') and 47 U.S.C. § 222(c)(1) (similar
prohibition).

### COUNT IV: THE SELECT COMMITTEE IS A FEDERAL GOVERNMENT BODY ACTIVELY ABRIDGING PLAITNIFFS' FIRST AMENDMENT RIGHTS AND SETTING A CHILLING EFFECT ON THE EXERCISE OF THOSE RIGHTS

87. Plaintiffs reallege all allegations from paras 1-86.

88. Plaintiffs understand that this Court must work to balance the competing interests between
individual privacy and public interests.

89. However, with respect to Alexander's willingness to produce voluminous documents,
appear for eight (8) hours for testimony, and provide records within the scope of some of
what the Select Committee seeks in the Verizon Subpoena, the Court must ask, what else
could the Select Committee possibly be seeking that satisfies its constitutional authority

and resolution-limiting scope? There is nothing.

90. There can be no public interest in Alexander's private life or actions or interactions that are prior to even the formation of his 2020 "Stop the Steal" efforts.

91. Likewise, there cannot be public interests—none that have a legislative remedy that would prevent a future attack at the Capitol—in probing Alexander's interactions post-attack.

92. That is a duty not reserved for Congress. *See, e.g., Barenblatt v. United States*, 360 U.S. 109, 112 (1959), *Watkins v. United States*, 354 U.S. 178, 197 (1957), *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539 (1963).

93. Because the Select Committee is issuing subpoena for third-party information, and without notice, there is no one to contest or object (rights afforded to witnesses producing documents and testimony) on the grounds of pertinency and forcing the Select Committee, as it is constitutionally required to do (*Deutch v. United States*, 367 U.S. 456, 467-68 (1961)), to establish a nexus between the information sought and a subject of overriding and compelling public interest.

94. The Select Committee has not provided clarity in what or why they're seeking broad phone records from the Plaintiffs. The opportunity to request clarity and object is established precedent (*Watkins*, 354 U.S. at 214-15).

95. Some colleagues, business prospects, former clients, and associates have not spoken to Mr. Alexander or ceased communication with him because of public reports that his phone records would be obtained. This has harmed his ability to effectively exercise his First Amendment rights and conduct his business.

96. Mr. Alexander used his personal mobile device to engage in protected advocacy and other speech, including privileged speech with his attorney(s) and clergy. Mr. Alexander,

himself, is also a Christian minister and engaged in counseling, prayers, and ministerial duties using his mobile phone.

97. All of these associational and expressive activities are protected by the First Amendment. Recall, Alexander runs an organization and his membership is constitutionally protected. *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *Black Panther Party v. Smith*, 661 F.2d 1243, 1267 (D.C. Cir. 1981); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 179 (D.C. Cir. 2003); *NAACP v. Alabama*, 357 U.S. 440 (1958).

98. The information sought from Verizon by the Select Committee would also intrude on Plaintiffs; rights to freedom of association as protected by the First Amendment of the U.S. Constitution. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).  Volunteers, such as Plaintiff Torre, would be discouraged from participating in future efforts with Mr. Alexander if their phone records can be subpoenaed so arbitrarily and their private phone contacts exposed to government scrutiny and harassment.

99. Alexander's First Amendment rights and future 2022 election cycle activities are and will be injured by Committee's far-reaching general warrant a/k/a Verizon Subpoena.

100.     There was no evidence suggesting that Plaintiffs, and upon information and belief there is no evidence from any witness, participated in or planned to organize an attack on the Capitol**.**  There was no evidence suggesting that Plaintiffs, and upon information and belief there is no evidence from any witness, participated in or planned to organize an attack on the Capitol. In fact, senior FBI officials have testified that their investigation found no criminal wrongdoing on the speakers and organizers, such as Plaintiff Alexander, and their respective organizations. See https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/

101.    At Alexander's December 9, 2021 deposition, he testified that he had a few phone conversations with Representative Paul Gosar and no verbal phone conversations with Representatives Andy Biggs or Mo Brooks that he recalls. The Select Committee asked him about all three Members of Congress. Mr. Alexander testified that he had phone conversations with Rep. Brooks' staff about a "Dear Colleague" letter and how his activists could be helpful. Mr. Alexander believes he exchanged a text message with Rep. Brooks, contents which he provided to the Committee. He also testified that he spoke to Rep. Biggs in person and never by phone, to the best of his recollection. In January, Mr. Alexander held an organizing call where Members of Congress might have been present, and some were invited. He doesn't recall who was in attendance because there was no roll call of attendees because the call was so large.

102.    On January 6, 2021, it was reported that Mr. Alexander had a call with fundraiser Ms. Kimberly Guilfoyle. Mr. Alexander volunteered this information on a radio show that early morning. The Select Committee asked him about this call. He stated that it was a short and pleasant call. Ms. Guilfoyle thanked Mr. Alexander for being a leader on voting rights and creating the "Stop the Steal" movement. The two spoke about the ongoing Georgia election and the GOP primaries that would take place in 2022. The Select Committee seemed satisfied with Alexander's explanation of that short call.

103.    The Select Committee is probing Plaintiff because of his political beliefs and work covered by the First Amendment. The Committee should be very deliberate and precise about inquiries as Plaintiff has already experienced a chilling effect on his First Amendment activities (losing work and closing a bank account due to the Committee's inquiries). Sweeping up communications from whole periods of time, and leaking that to

the press, further injures Plaintiff's First Amendment activities.

104.    There is no reason to believe that the full record of personal and political contacts of each of the Plaintiffs, extending for nearly two months before the January 5 and 6 rally (long before they were  even a remote possibility) and continuing for a month afterwards, is necessary to supplement their fulsome explanation of the events of the rally and preceding to it for the Select Committee to do its legislative remedies..

105.    Instead, the Select Committee's Subpoena will yield data that will be used to populate a massive database of the personal friends and political associates of not just Plaintiffs, but everyone who has had any connection with the belief in election integrity, government skepticism, other political associations or vendors who worked with Plaintiff Alexander.. By analyzing data patterns in phone numbers, call session times, text messages, and geolocation data, investigators can build a permanent nationwide model of intimate political associations and networks within the conservative movement that has relevance

106.    Such phone database It is far beyond "legislating" to deal with Capitol security or preventing another breach of the Capitol or any other federal building such as the Supreme Court where pro-abortion activists charged the Supreme Court building last Spring and where Senator Schumer, on the steps of the Supreme Court, while it was hearing an abortion case, threatened Justices Kavanaugh and Gorsuch by turning to the Court and shouted, "you won't know what hit you" if the Justices ruled against the pro- abortion position**.**  See National Review, *"Schumer to Gorsuch and Kavanaugh: Nice Little Court Ya Got There, Hate to See Anything Happen to It ..."*  (March 5, 2020). See https://www.nationalreview.com/2020/03/chuck-schumer-attack-on-supreme-court-

despicable/

107.     The billions of data points yielded can recreate not just intimate relationships, but also locations and movements, creating a virtual CAT-scan of the Select Committee's political opposition, likely including even their own colleagues in the House of Representatives.

108.     It is significant that the Verizon Subpoena uniformly asks for three months of phone records for a large number of people, some of whom touch upon the Committee's inquiry for only a few days. Plaintiff Alexander did not become aware of the potential for a January 6 rally or permitted protest near the Capitol until or about December 16 or 17, 2021. Verizon Subpoena asks for data predating the origin of the idea of such an event by a month and a half.

109.     Plaintiffs' personal account information, and the complete record of their private phone and text contacts with all of their political and personal acquaintances for three months, is not pertinent to any inquiry into what happened on January 6, or its causes. Instead, it is an impermissible attempt to harass the Plaintiffs, identify their close colleagues, and potentially subject even those individuals and their carriers to subpoenas. Not only does this chill communication among these friends and political associates, it builds an opposition research file for the 2022 election cycle for the single party that mans, staffs, and controls the Select Committee.

110.     Plaintiff Alexander has already experienced financial losses, opportunity losses, and additional sufferings related to his 2022 election work because of the Committee's extended non-January 6th probe into his work.

111.     Even if it had a valid reason to seek protected information, the Select Committee

has put in place no safeguards to protec Plaintiffs' rights.

112.     The Select Committee has a well-documented history of leaking to at least one news outlet in particular. That news outlet has been hostile to Mr. Alexander and is privy to documents the public does not have access to. The distribution of committee materials or characterizing them is prohibited for staff or Members to do by law.

113.     The Verizon Subpoena is also a clear effort to chill the speech of the Select Committee Members political adversaries.

114.     Mr. Alexander is a prominent political activist and grassroots organizer; an unelected Republican who has never sought governmental office.

115.     Prior to the Select Committee's formation, Mr. Alexander campaigned against the re-election of the only two Republicans on the Select Committee; Republicans who were not appointed by the Republican caucus.

116.     Mr. Alexander reasonably fears this is payback for his beliefs and lawful campaign activity that is being lumped in with illegal acts; and before a body that is not permitted to do either such thing.

117.     The two Republican members of the Committee have a personal conflict.

118.     Allowing an entirely partisan select committee of Congress to subpoena the personal mobile phone data of prominent activists and legal permit holders would have a massive chilling effect on current and future activists' associational and free speech rights.

119.     The Select Committee's Subpoenas will yield data that will be used to populate a massive database of the personal friends and political associates of not just Plaintiffs', but everyone who has had any connection with the belief in election integrity, government skepticism, other political associations or vendors who worked with Plaintiff Alexander.

By analyzing data patterns in phone numbers, call session times, text messages, and geolocation data, investigators can build a permanent nationwide model of intimate political associations and networks within the conservative movement that has relevance far beyond "legislating" to deal with Capitol security or preventing another breach of the Capitol. The billions of data points yielded can recreate not just intimate relationships, but also locations and movements, creating a virtual CAT-scan of the Select Committee's political opposition, likely including even their own colleagues in the House of Representatives.

120.     What if the opposite were to happen to "Black Lives Matter" activists who attacked federal buildings during a Republican majority? Without any limit as to date range or geography or persons?

121.     In that regard, the Danelle Brian, the Chair of the Project on Government Oversight (POGO), submitted a letter to Committee Chairman Thompson on October 5, 2021, expressing grave concerns about the subpoena impact on First Amendment freedoms, stating in part:

> Indeed, we at POGO were the subject of overreaching subpoena in the 1990s, including subpoena for my home phone records, in an effort to identify whistleblowers who had exposed the oil and gas industry's fraud in underpaying royalties.[5]

> If similar efforts to target and malign government critics or marginalized communities are attempted in the future, it is vital they cannot weaponize the vast array of private digital information that exists in modern society, or collect such information to harm or chill expression by religious minorities, political dissidents, or whistleblowers. The actions the committee takes in the coming weeks may set important precedent for how congressional demands for records are used going forward.

https://www.pogo.org/letter/2021/10/letter-to-january-6-committee-supporting-careful-use-of-subpoena-authority/

122.    The Select Committee's asserted interest is insufficient and its alternative means of

obtaining this information are too obvious to justify such a drastic chilling of speech.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs asks the Court to enter judgment in their favor and against

Defendants  and to order the following relief:

a.   A declaratory judgment that the Verizon Subpoenas are ultra vires, unlawful, and
     unenforceable;

b.   A declaratory judgment that the Verizon Subpoenas, in part or in whole, serve no
     valid legislative purpose and exceeds the Select Committee's Constitutional
     authority;

c.   A declaratory judgment that compliance with the Verizon Subpoenas would
     violate the Stored Communications Act;

d.   A declaratory judgment that the Verizon Subpoenas violate Platntiffs' Fourth
     Amendment rights;

e.   A declaratory judgment that the Verizon Subpoenas violate Plaintiffs' First
     Amendment and Due Process rights;

f.   An injunction prohibiting Verizon from producing any phone data to the Select
     Committee and that any data submitted be returned to the Plaintiffs if produced.

g.   An injunction prohibiting the Committee from using any phone data submitted by
     Verizon the Select Committee and that any data submitted be returned to the
     Plaintiffs if produced or destroyed.

h.   In the alternative, an order modifying the Verizon Subpoenas to seek only
     unprivileged information, in a specified date range (ex. January 1, 2021 09:00 AM

28

to January 6, 2021 18:00 PM), that does not infringe on Plaintiffs' constitutional rights;

i.   An injunction quashing the Verizon Subpoenas and prohibiting their enforcement by Defendants;

j.   An injunction prohibiting Defendants from imposing sanctions for noncompliance with the Verizon Subpoena;

k.   An injunction prohibiting Defendants from inspecting, using, maintaining, or disclosing any information obtained as a result of the Verizon Subpoenas;

l.   An award in favor of Plaintiffs for their reasonable expenses, including attorneys' fees and costs, incurred as a result of the Verizon Subpoenas; and

m.  Any and all other relief that the Court deems just and proper.

Dated:  March 7, 2022                         Respectfully submitted,

                                             */s/Paul D. Kamenar*
                                             Paul D. Kamenar
                                             D.C. Bar 914200
                                             1629 K Street, N.W. Suite 300
                                             Washington, D.C. 20006
                                             Telephone:  (301) 257-9435
                                             paul.kamenar@gmail.com

                                             */s/Jonathon Moseley*
                                             Jonathan A. Mosely
                                             USDCDC Bar No. VA005
                                             Virginia State Bar No. 41058
                                             Mailing address only:
                                             5765-F Burke Centre Parkway, PMB #337
                                             Burke, Virginia 22015
                                             Telephone:  (703) 656-1230
                                             Facsimile:  (703) 997-0937
                                             Contact@JonMoseley.com
                                             Moseley391@gmail.com

                                             *Counsel for Plaintiffs*