# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALI ALEXANDER, *et al.* | |
| *Plaintiffs*, | |
| v. | No. 1:21-cv-03308-CJN |
| NANCY PELOSI, *et al.* | |
| *Defendants*. | |

## CONGRESSIONAL DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants the Honorable Nancy Pelosi, the Honorable Bennie G. Thompson, the Honorable Elizabeth L. Cheney, the Honorable Adam B. Schiff, the Honorable Jamie B. Raskin, the Honorable Susan E. Lofgren, the Honorable Elaine G. Luria, the Honorable Peter R. Aguilar, the Honorable Stephanie Murphy, the Honorable Adam D. Kinzinger, and the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol ("Congressional Defendants") respectfully move for an order dismissing Plaintiffs' First Amended Complaint (Mar. 7, 2022) (ECF No. 7).  For the reasons set forth in the accompanying Memorandum of Points and Authorities, the Complaint should be dismissed with prejudice.

A proposed order is attached.

Respectfully submitted,

/s/ *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

ARNOLD & PORTER
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte[*]
Noam Biale
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com

2

MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

May 24, 2022

---

[*] Appearing pursuant to 2 U.S.C. § 5571(a).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALI ALEXANDER, *et al.* ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-03308-CJN |
| ) | |
| NANCY PELOSI, *et al.* ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW
<u>IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION .........................................................................**Error! Bookmark not defined.**

BACKGROUND ...........................................................................**Error! Bookmark not defined.**

    A.     The January 6th Attack ...........................................**Error! Bookmark not defined.**

    B.     The Formation of the Select Committee ..................................................... 7

    C.     The Select Committee's Subpoenas to Verizon....................................... 8

STANDARD OF REVIEW ..........................................................**Error! Bookmark not defined.**

ARGUMENT ....................................................................................... 10

II.     The Select Committee Is a Duly Authorized Committee .................................................. 10

III.    The Subpoenas Are Not Overly Broad or Beyond the Scope of the Select Committee's Jurisdiction ....................................................**Error! Bookmark not defined.**

IV.    The Subpoenas Do Not Violate the Fourth Amendment ................................................. 19

V.     The Stored Communications Act Does Not Limit the Select Committee's Authority to Obtain Non-Content Information from Verizon Pursuant to a Lawful Subpoena....................................................................**Error! Bookmark not defined.**

VI.    The Subpoenas Do Not Violate the First Amendment ......**Error! Bookmark not defined.**

CONCLUSION..............................................................................**Error! Bookmark not defined.**

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..................................................................................................9

*Barenblatt v. United States,*
  360 U.S. 109 (1959)............................................................................................25, 26

*\*Barker v. Conroy,*
  921 F.3d 1118 (D.C. Cir. 2019) ............................................................................10

*Barry v. U.S. ex rel. Cunningham,*
  279 U.S. 597(1929)..................................................................................................11

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................................10

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO,*
  860 F.2d 346 (9th Cir. 1988). .................................................................................25

*Brown v. Sprint Corp. Sec. Specialist,*
  2019 WL 418100 (E.D.N.Y. Jan. 31, 2019) ..........................................................21

*Buckley v. Valeo,*
  424 U.S. 1 (1976)..............................................................................................25, 26

*Burnap v. United States,*
  252 U.S. 512 (1920)................................................................................................24

*\*Budowich v. Pelosi,*
  No. 21-cv-3366 (D.D.C.) ........................................................................................15

*Carpenter v. United States,*
  138 S. Ct. 2206 (2018)......................................................................................20, 21

*Digital Realty Tr., Inc. v. Somers,*
  138 S. Ct. 767 (2018)..............................................................................................22

*Eastland v. United States Servicemen's Fund,*
  421 U.S. 491 (1975)..........................................................................................19, 24

*\*Eastman v. Thompson,*
  No. 8:22-cv-00099 (C.D. Cal.) ...............................................................................15

*Hubbard v. United States*,
    514 U.S. 695 (1995)..................................................................................23

*McGrain v. Daugherty*,
    273 U.S. 135 (1927)..................................................................................17

*McPhaul v. United States*,
    364 U.S. 372 (1960)..................................................................................19

*Meadows v. Pelosi*,
    No. 21-3217 (D.D.C.) ..............................................................................15

*Quinn v. United States*,
    349 U.S. 155 (1955)..................................................................................17

*Rangel v. Boehner*,
    20 F. Supp. 3d 148 (D.D.C. 2013) .........................................................10

*\*Repub. Nat'l Comm. v. Pelosi ("RNC")*,
    No. 22-659 (D.D.C.) .....................................................................13, 14, 15

*Senate Permanent Subcomm. v. Ferrer*,
    199 F. Supp. 3d 125 (D.D.C. 2016). ................................................25, 26

*Smith v. Md.*,
    442 U.S. 735 (1979)............................................................................20, 21

*Trump v. Deutsche Bank AG*,
    943 F.3d 627 (2d Cir. 2019)..............................................................24, 25

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020)......................................................................17, 24

*\*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021)...................................................1, 2, 18, 26

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
    933 F.3d 728 (D.C. Cir. 2019) ................................................................16

*United States v. Beverly*,
    943 F.3d 225 (5th Cir. 2019) ..................................................................21

*United States v. Bramblett*,
    348 U.S. 503 (1955)..................................................................................23

*United States v. Chem. Found., Inc.*,
    272 U.S. 1 (1926)......................................................................................11

*United States v. Durenberger*,
    48 F.3d 1239 (D.C. Cir. 1995) ....................................................................................15

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) .............................................................................10, 14

*United States v. Searcy*,
    2021 WL 3616062 (W.D. Pa. Aug. 16, 2021) ...........................................................21

*United States v. Torre*,
    Nos. 1:21-mj-00191, 1:21-cr-00143 (D.D.C. Feb. 2, 2021) ......................................6

*Vander Jagt v. O'Neill*,
    699 F.2d 1166 (D.C. Cir. 1982) .................................................................................10

**Statutes**

26 U.S.C. §§ 8001-05 ...........................................................................................................11

18 U.S.C. § 6 ........................................................................................................................23

18 U.S.C. § 2701 *et seq.* .......................................................................................................21

    18 U.S.C. § 2702 ..........................................................................................................22, 24

    18 U.S.C. § 2711 ................................................................................................................22

    18 U.S.C. § 2712 ................................................................................................................24

40 U.S.C. § 5104 ....................................................................................................................6

**Legislative & Constitutional Authorities**

165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) .................................................................11

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) ..................................................................12, 16

167 Cong. Reg. H5760 (daily ed. Oct. 21, 2021) ................................................................14

167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) ...........................................................14

167 Cong. Rec. H7786 (daily ed. Dec. 14, 2021) ................................................................13

167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ................................................................13

167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) ...........................................................14

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) ..................................................................13

168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022)....................................................14

False Statements Accountability Act of 1996,
    Pub. L. No. 104-292...........................................................................................23

H. Rep. No. 109-377 (2006) ......................................................................................12

H. Res. 6, 116th Cong. (2019) ...................................................................................16

H. Res. 24, 110th Cong. (2007) .................................................................................17

H. Res. 437, 109th Cong. (2005) ...............................................................................12

H. Res. 503, 117th Cong. (2021) .........................................2, 7, 8, 11, 12, 13, 14, 16, 18, 19, 20

H. Res. 730, 117th Cong. (2021) ...............................................................................14

H. Res. 851, 117th Cong. (2021) ...............................................................................14

H. Res. 1037, 117th Cong. (2022) .............................................................................14

Rules of the U.S. House of Representatives, 117th Cong. (2021)

    Rule I.................................................................................................................12, 16

    Rule X....................................................................................................................11

U.S. Const., Art. I, § 5, cl. 2.......................................................................................10

## **Other**

8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172........................16

Aaron R. Cooper, *Congressional Surveillance*,
    70 Am. U. L. Rev. 1799 (2021) .........................................................................24

Alan Feuer, *Pro-Trump Rally Planner is Cooperating in Justice Dept.'s Jan. 6 Inquiry,* N.Y.
    Times, (Apr. 8, 2022).............................................................................................3

Ali Alexander, *Statement on Illegitimate Impeachment and January 6th,*
    https://perma.cc/RW8L-YYLG ...........................................................................2

Barton Gellman, *The Election That Could Break America,*
    The Atlantic (Sept. 23, 2020)..............................................................................18

*Black's Law Dictionary* (11th ed. 2019).....................................................................16

Brian Naylor, *Read Trump's Jan 6 speech, a key part of impeachment trial*, NPR, (Feb. 10, 2021,
    2:43 PM) .................................................................................................................6

Ford Fischer (@FordFischer), Twitter (Jan. 8, 2021, 6:24 PM) .......................................6

Frank Reddy, *Quick reaction earns praise for vacationing brothers,*
    Forsyth Cnty. News (Aug. 7, 2008, 3:27 PM) ...........................................................7

Jordan Fischer, *Capitol riots: InfoWar host Owen Shroyer charged in Capitol riot*, WUSA9,
    (Aug. 20, 2021, 5:08 PM) ...........................................................................6

Letter from Chairman Bennie G. Thompson, Chair of the Select Comm. to Investigate the
    January 6th Attack on the U.S. Capitol, to Ali Abdul Akbar, also known as Ali Alexander
    (Oct. 7, 2021) ("Thompson Letter") ..............................................................2, 3, 5

Marissa J. Lang, *et al.*, *After thousands of Trump supporters rally in D.C., violence erupts when
    night falls,* Wash. Post, (Nov. 15, 2020, 12:30 AM) ................................................3

Philip Bump, *A key Jan. 6 figure tries the Trump defense:  I just riled everyone up and brought
    them there,* Wash. Post (Dec. 9, 2021, 10:04 AM) ...................................................5

Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about
    Pelosi's Abuse of Power on Jan. 6th Select Committee (July 21, 2021),
    https://perma.cc/4JNC-73R2 ........................................................................8

Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on
    Republican Recommendations to Serve on the Select Comm. to Investigate
    the Jan. 6th Attack on the U.S. Capitol (July 21, 2021),
    https://perma.cc/B86B-SJTA .......................................................................8

Tom Jackman, *et al.*, *Proud Boys sparked clashes during pro-Trump rally, D.C. officials say,*
    Wash. Post (Dec. 13, 2020, 10:32 PM) .............................................................3

Will Carless, *Nation's capital braces for violence as extremist groups converge to protest
    Trump's election loss,* USA Today (Jan. 5, 2021, 4:49 PM) ........................................3

## INTRODUCTION

Once again, persons who tried to overturn an election are attempting to prevent a properly constituted Congressional committee from "investigating the single most deadly attack on the Capitol by domestic forces" and evaluating the need for legislation to "ensur[e] the safe and uninterrupted conduct of [Congress's] constitutionally assigned business." *Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021), *injunction denied*, 142 S. Ct. 680 (2022), *cert. denied*, 142 S. Ct. 1350 (2022) (No. 21-932).

Plaintiff Ali Alexander, who played a key role in setting the stage for the January 6th attacks, and Plaintiff Christine Torre, who appears to share a phone plan with her son Benjamin Torre, an admitted U.S. Capitol intruder, are trying to block a subpoena issued by the House Select Committee to Investigate the January 6th Attack on the United States Capitol (Select Committee) to Verizon Communications Inc. seeking subscriber information, connection records, and records of session times and durations of calls from November 1, 2020, through January 31, 2021, for phone numbers associated with Plaintiffs' Verizon accounts (the subpoena did not seek communications content or any geo-location information).  Plaintiffs ask this Court to enjoin enforcement of that subpoena and to declare the Select Committee invalid.  Supreme Court and D.C. Circuit precedent, along with long-established constitutional principles, compel rejection of these claims.

*First*, Plaintiffs are wrong that the Select Committee is not duly authorized.  Every court that has considered this argument has rejected it.  *Second*, the subpoenas are not overly broad nor beyond the scope of the Select Committee's jurisdiction.  *Third*, the subpoenas do not violate the Fourth Amendment.  *Fourth*, the Stored Communications Act does not restrict the Select Committee's lawful subpoena seeking non-content information.  *Fifth*, the subpoenas do not violate the First Amendment.

1

In short, the Complaint presses a variety of flawed legal claims to thwart the Select Committee's efforts to understand fully, and to prevent a recurrence of, the events of January 6th.  The Court should dismiss the Complaint in its entirety.

## BACKGROUND

### A.    The January 6th Attack

On January 6, 2021, violent rioters seeking to stop the peaceful transfer of power following the 2020 Presidential election launched a violent assault on the United States Capitol. H. Res. 503, 117th Cong. (2021), Preamble.  Rioters attacked police, breached the Capitol, and obstructed and impeded the electoral vote.  The attack on the Capitol ultimately "left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol."  *Trump*, 20 F.4th at 15 (citation omitted).  Law enforcement eventually cleared the rioters, and the electoral count successfully resumed later that night after a nearly six-hour delay.

### 1.  Ali Alexander

January 6th was the culmination of months of organized attacks on the legitimacy of the 2020 presidential election and false claims about its winner.  Plaintiff Ali Alexander was directly involved in these events as a founder and leader of "Stop the Steal," an organization that arranged numerous rallies across the country and maintained the websites "StopTheSteal.us" and "WildProtest.com."  *See* Ali Alexander, *Statement on Illegitimate Impeachment and January 6th*;[1] Letter from Chairman Bennie G. Thompson to Ali Abdul Akbar, also known as Ali Alexander (Oct. 7, 2021) ("Thompson Letter").[2]

---

[1] *Available at* https://perma.cc/RW8L-YYLG.

[2] *Available at* https://perma.cc/Y9CH-WQUU.

Mr. Alexander organized, and advertised on StopTheSteal.us, rallies in Washington, D.C., on November 14 and December 12 to protest the results of the Presidential election. *See, e.g.,* Alan Feuer, *Pro-Trump Rally Planner is Cooperating in Justice Dept.'s Jan. 6 Inquiry,* N.Y. Times, (Apr. 8, 2022).[3]  Members of the Proud Boys extremist group clad in their distinctive black-and-yellow garb were photographed by the press among the November 14 rallygoers.  *See, e.g.,* Marissa J. Lang, *et al.*, *After thousands of Trump supporters rally in D.C., violence erupts when night falls,* Wash. Post, (Nov. 15, 2020).[4]  According to press reports, while much of the day was peaceful, clashes occurred between rallygoers and counter-protesters.  *See id.*  After nightfall, more serious violence broke out, and at least 20 individuals were arrested.  *See id.*

The December 12 rally was even more violent, leading to the arrests of 39 people for protest-related activities.  *See, e.g.,* Tom Jackman, *et al.*, *Proud Boys sparked clashes during pro-Trump rally, D.C. officials say,* Wash. Post (Dec. 13, 2020).[5]  Eight police officers were injured, four people were stabbed, and four churches were vandalized.  *See id.*  According to District of Columbia officials, members of the Proud Boys organization who refused to accept the results of the Presidential election sparked the violence.  *See id.*

On December 19, 2020, former President Trump tweeted the following: "Statistically impossible to have lost the 2020 Election.  Big protest in D.C. on January 6th.  Be there, will be wild!"  Will Carless, *Nation's capital braces for violence as extremist groups converge to protest*

---

[3] *Available at* https://perma.cc/ZR9P-Z8LD.  The relevant pages from StopTheSteal.com are not currently on the website; archives of the pages as they appeared at the time are available at https://perma.cc/A69K-QFK5 and https://perma.cc/G4NC-QVJ9.

[4] *Available at* https://perma.cc/U6U3-SZM8.

[5] *Available at* https://perma.cc/U9VK-EEAS.

*Trump's election loss,* USA Today (Jan. 5, 2021).[6]  The WildProtest.com website then posted this: "We the People must take to US Capitol lawn and steps and tell Congress #DoNotCertify on #JAN6!  Congress cannot certify this fraudulent Electoral College.  Our presence in Washington D.C. will let Members of Congress know that we stand with Rep. Mo Brooks and his colleagues in the House of Representatives who will bravely object to the certification of the Electoral College."[7]  The website heading was "PRESIDENT TRUMP WANTS YOU IN DC JANUARY 6."[8]

In a December 28, 2020 video, Mr. Alexander claimed "I'm the guy who came up with the idea of January 6th when I was talking with Congressman [Paul] Gosar, Congressman Andy Biggs, and Congressman Mo Brooks" in order to "build momentum and pressure" on Members of Congress who would be loath to oppose "that mob."  *See* Andrew Kaczynski and Em Steck, *Videos show 'Stop the Steal' rally organizer saying he would work with extremist groups*, CNN (Jan. 22, 2022).[9]  In a December 23, 2020 video, he said that he would "talk to the Proud Boys" and "talk to the Oath Keepers" to arrange for security on January 6.  *See id.*[10]

---

[6] *Available at* https://perma.cc/56A5-X6QM.

[7] The WildProtest.com website is no longer operative.  An archive of the website as it appeared at the time is available at https://perma.cc/T84T-K2NT.

[8] *Id.*

[9] *Available at* https://perma.cc/6ZE6-94AF.  The video is linked in the article and is available at https://perma.cc/ZQH9-82B8.

[10] The video is linked in the article and is available at the third of the three links at https://perma.cc/9FUV-NC5L.

Mr. Alexander also organized a rally on the U.S. Capitol grounds scheduled for January 6, 2021.  *See* First Am. Compl. ¶ 3.  He advertised on one of his websites[11] that the event would take place from 10:00 A.M. until 5:00 P.M. and sought a permit for 50 people under the name of the organization "One Nation Under God."  *See id.*; Thompson Letter at 2.

According to press reports, in the weeks before the January 6th attack, Mr. Alexander made repeated references at Stop-the-Steal-sponsored events to the possible use of violence to achieve the goals of the organization.  *See* Philip Bump, *A key Jan. 6 figure tries the Trump defense:  I just riled everyone up and brought them there,* Wash. Post (Dec. 9, 2021).[12]  At a D.C. rally the day before the attack, Mr. Alexander reportedly led the crowd in a chant of "victory, or death."  Thompson Letter at 2.

Mr. Alexander is reported to have claimed to have been in communication with the White House and Members of Congress regarding events planned to coincide with the certification of the 2020 Electoral College results.  *See* Thompson Letter at 2.  Among the "Invited Speakers & Featured Guests" advertised on his website for his January 6th event were Roger Stone, Representative Paul Gosar, Representative Marjorie Taylor Greene, and Representative Lauren Boebert.[13]

On the morning of January 6th, Mr. Alexander was a "VIP guest" at the Ellipse rally at which President Trump spoke.  First Am. Compl. ¶ 3.  In his speech, the former president said,

---

[11] An archive of the website as it appeared at the time is available at https://perma.cc/T84T-K2NT.

[12] *Available at* https://perma.cc/D6WQ-64EV.

[13] An archive of the website as it appeared at the time is available at https://perma.cc/T84T-K2NT.

"All of us here today do not want to see election victory stolen . . . We will never give up, we will never concede . . . Our country has had enough . . .We will not take it anymore . . . We will stop the steal."  *See* Brian Naylor, *Read Trump's Jan 6 speech, a key part of impeachment trial*, NPR, (Feb. 10, 2021).[14]

Following the Ellipse rally, Mr. Alexander marched to the Capitol with Alex Jones and others.  *See* Ford Fischer (@FordFischer), Twitter (Jan. 8, 2021, 6:24 PM);[15] Jordan Fischer, *Capitol riots: InfoWar host Owen Shroyer charged in Capitol riot*, WUSA9, (Aug. 20, 2021).[16] There, he witnessed individuals "clashing with police near the Capitol Building" on the building's west side.  First Am. Compl. ¶¶ 4-5.

**2. Benjamin Torre and Christine Torre**

Benjamin Torre, a resident of Dawsonville, GA, traveled to Washington, D.C., with his parents on January 4, 2021.  Criminal Complaint, *United States v. Torre*, 1:21-mj-00191 (Feb. 2, 2021)[17] at 5; Statement of Offence, *United States v. Torre*, 1:21-mj-00191 (March 9, 2022)[18] ¶ 8. On January 6th, he climbed through a broken window and entered the U.S. Capitol.  *See* Statement of Offense ¶ 10.  He subsequently pleaded guilty to criminal charges of Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).  *See* *id.* ¶ 12.  Mr. Torre is not a party to this lawsuit.

---

[14] *Available at* https://perma.cc/PLH7-NCSP.

[15] *Available at* https://perma.cc/X9QQ-GQBM.

[16] *Available at* https://perma.cc/U2MU-XUQX.

[17] *Available at* https://perma.cc/R797-Q6NC.

[18] *Available at* https://perma.cc/RB32-8Q5H.

Plaintiff Christine Torre alleges that Verizon informed her that the Select Committee sought the telephone records of all members of her family telephone plan, which includes, *inter alios*, "one of her three sons."  First Am. Compl. ¶ 26.  Defendants believe that Mr. Benjamin Torre is the son of Ms. Christine Torre, who is also a resident of Dawsonville, GA, *see id*. ¶ 17, and who also admitted traveling to Washington, D.C., to attend rallies on January 5th and 6th, *see id*. ¶ 23.  Specifically, Ms. Torre and her husband "met Plaintiff Alexander and offered to help with get-out-the-vote efforts for the special Senate election," *id.* ¶ 22, and subsequently "traveled to Washington, D.C. to continue to act as volunteers of Stop the Steal campaign by passing out small signs at the rally on January 5, 2021 at Freedom Plaza and attended the Ellipse rally on January 6, 2021," *id.* ¶ 23.  *See also* Frank Reddy, *Quick reaction earns praise for vacationing brothers,* Forsyth County News (Aug. 7, 2008) (discussing a Georgia resident named Christine Torre and her three sons, one of whom is named Benjamin).[19]

### B.      The Formation of the Select Committee

In response to this unprecedented attack, the House of Representatives adopted House Resolution 503, "establish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol."  H. Res. 503, 117th Cong. § 1.  The resolution authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures . . . as it may deem necessary."  H. Res. 503 § 4(a)(1)-(3).

---

[19] *Available at* https://perma.cc/JG5L-CWSC.

To carry out those functions, House Resolution 503 authorizes the Speaker of the House to appoint up to thirteen Members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader."  H. Res. 503 § 2(a).  Consistent with the Resolution, the Speaker initially appointed seven Democrats and one Republican and then consulted with the House Minority Leader, who recommended five additional Republicans.[20]  The Speaker then spoke with the Minority Leader, advised that she would appoint three of those he had recommended, and asked the Minority Leader to recommend two other Republicans.[21]  After the Minority Leader declined to do so and, instead, withdrew all five of his recommendations, the Speaker named an additional Republican to the Select Committee.[22]  Since then, the Select Committee has functioned with seven Democrats and two Republicans.

### C.     The Select Committee's Subpoenas to Verizon

In furtherance of its duty to investigate the facts, circumstances, and causes of the attack on January 6th, the Select Committee has issued subpoenas to various government agencies, private companies, and certain individuals.  The Select Committee served Verizon with a subpoena seeking subscriber information, connection records, and records of session times and durations of calls for the period of November 1, 2020, through January 31, 2021, for Mr. Alexander's Verizon account (no communications content or geolocation data were sought).  *See* First Am. Compl. Ex. A.

---

[20] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release).

[21] *Id.*

[22] *See also* Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on Jan. 6th Select Committee (July 21, 2021), https://perma.cc/4JNC-73R2.

The Select Committee served Verizon with a subpoena seeking subscriber information, connection records, and records of session times and durations of calls for the period of November 1, 2020, through January 31, 2021, for Ms. Torre's Verizon account (no communications content or geolocation data were sought). *See* First Am. Comp. Ex. B.

Mr. Alexander filed this case on December 17, 2021, ECF No. 1, and filed an amended complaint on March 7, 2022, adding Ms. Torre as a plaintiff, First Am. Compl., at 4, ECF No. 7; Corrected Am. Compl., at 4, ECF No. 8.[23]  Plaintiffs ask this Court to declare that the Verizon Subpoenas: "are *ultra vires*, unlawful, and unenforceable"; "serve no valid legislative purpose and exceed[] the Select Committee's Constitutional authority"; "would violate the Stored Communications Act"; "violate Platntiffs' [*sic*] Fourth Amendment rights"; and "violate Plaintiffs' First Amendment and Due Process rights."  First Am. Compl. Prayer for Relief ¶¶ a-e. Plaintiffs also ask this Court to issue an injunction: "prohibiting Verizon from producing any phone data to the Select Committee and [requiring] that any data submitted be returned to the Plaintiffs if produced"; "prohibiting the Committee from using any phone data submitted by Verizon"; "[i]n the alternative, . . . modifying the Verizon Subpoenas"; "quashing the Verizon Subpoenas and prohibiting their enforcement"; "prohibiting Defendants from imposing sanctions"; and "prohibiting Defendants from inspecting, using, maintaining, or disclosing any information obtained as a result of the Verizon Subpoenas." *Id.* ¶¶ f-k.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

---

[23] Plaintiffs seek to add Plaintiff John Doe "pending resolution of the February 25, 2022, Motion for Leave to Add Additional Plaintiff Under Pseudonym, Docket Entry #6." First Am. Compl., at 1; *see* Corrected Am. Compl., at 1.

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

Plaintiffs' various theories have no merit, and this suit should be dismissed.

## II.      The Select Committee Is a Duly Authorized Committee

Plaintiffs allege that the Select Committee was not validly formed and therefore lacked authority to issue the subpoena to Verizon for Plaintiffs' records.  First Am. Compl. ¶¶ 50-57. Plaintiffs are wrong.

As an initial matter, Plaintiffs' demand that this Court override the actions of the House and its Speaker for assertedly not following the Select Committee's authorizing resolution violates Constitutional separation of powers principles.  The Constitution's Rulemaking Clause states that "[e]ach House may determine the Rules of its Proceedings."  U.S. Const., Art. I, § 5, cl. 2.  It is settled law in this Circuit that the Clause "'clearly reserves to each House of the Congress the authority to make its own rules,' and . . . interpreting a congressional rule 'differently than would the Congress itself' is tantamount to '*making* the Rules—a power that the Rulemaking Clause reserves to each House alone.'"  *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)); *see also Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013) (noting that the Rulemaking Clause provides exclusive power to Congress to "make its own rules about its internal proceedings").  As the D.C. Circuit has explained, it is a "startlingly unattractive idea, given our respect for a coequal branch of government, for us to tell the Speaker" whom to appoint to committees.  *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1176 (D.C. Cir. 1982) (internal quotation marks and citation omitted).

10

In addition, decisions by Congress interpreting its own rules are entitled to the "presumption in favor of regularity" that all government officials enjoy. *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity . . . cannot be denied to the proceedings of the houses of Congress, when acting upon matters within their constitutional authority.")  None of the allegations in the Complaint comes close to demonstrating the "clear evidence to the contrary," *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926), required to overcome that presumption.

Regardless, Plaintiffs' challenges to the Select Committee's composition and subpoena authority are deeply flawed.

*First*, Plaintiffs contend that Speaker Nancy Pelosi's appointment of nine members to the Select Committee was not "consistent with the authorizing resolution of the Select Committee" because "the authorizing resolution instructs the Speaker 'shall' appoint thirteen members." First Am. Compl. ¶ 55.  Plaintiffs are incorrect.

By way of background, the House has four different kinds of committees, each of which is established and governed by various House Rules, statutes, and House resolutions, or on an *ad hoc* basis.  *See, e.g.*, Rule X, Rules of the U.S. House of Representatives, 117th Cong. (2021) (House Rules) (rules governing "standing" Committees); 26 U.S.C. §§ 8001-05 (establishing the Joint Committee on Taxation); H. Res. 503 § 1 (establishing the Select Committee); 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) (appointment of conferees for H.J. Res. 31).  The House rules and procedures governing appointments to these four distinct types of committees vary. Significantly, under House rules, the Speaker appoints Members for all select committees, including the one at issue here.  *See* House Rule I.11, ("[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House.")  And, by unanimous consent, on

January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House."  *See* 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (statement of Rep. Hoyer).

Plaintiffs' attack on the composition of the Select Committee fails.  House Resolution 503 states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader."  H. Res. 503 § 2(a).  The Resolution does not require that *all* thirteen Members be appointed in order for the Select Committee to function, and the Congressional Defendants are aware of no rule or law providing that the authorization to appoint thirteen Members required that the Speaker appoint that precise number.

Indeed, interpretation of House rules is strongly informed by prior practice, and precedent supports a House select committee operating with fewer than its full allotment of Members.  Specifically, in the 109th Congress, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty members, using language substantially similar to the Resolution here.  *See* H. Res. 437, 109th Cong. § 2(a) (2005) ("The select committee shall be composed of 20 members appointed by the Speaker[.]").  Then-House Speaker Dennis Hastert appointed only eleven Members, all of whom were from the then-majority Republican Party.  *See* H. Rep. No. 109-377, at ii (2006) (listing Members).  Notably, that select committee likewise issued subpoenas.  *See id.* at 23 (noting that the Katrina Select Committee issued a subpoena to the Department of Defense, and that the Department complied).  This precedent strongly supports the Speaker's actions here.

Moreover, House Resolution 503 contemplates the possibility of "vacancies," but provides no specific timeline for filling them.  *See* H. Res. 503 § 2(c).  Nor does House

12

Resolution 503 provide that the Select Committee would become invalid, or that it must suspend all action, should a vacancy occur—even though, by definition, it would have fewer than thirteen members.  *See id.*

It is thus no surprise that every district court to have considered Plaintiffs' argument has rejected it.  As Judge Kelly of this district recently explained, "the House views the Select Committee to be duly constituted and empowered to act under its authorizing resolution, even though the Select Committee has only nine members.  This understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas." *Repub. Nat'l Comm. v. Pelosi ("RNC")*, No. 22-659, 2022 WL 1294509, at *15 (D.D.C. May 1, 2022), *appeal pending*, No. 22-5123 (D.C. Cir.).  Indeed, the full House affirmatively ratified the relevant actions of the Select Committee in the face of challenges on the House floor identical to the challenges Plaintiffs raise here.

For example, when the full House debated the resolutions recommending referral of Steve Bannon, Mark Meadows, Peter Navarro, and Daniel Scavino, Jr. for contempt of Congress for failure to comply with Select Committee subpoenas, several Members of Congress raised the argument about the composition of the Select Committee.[24]  The full House nonetheless

---

[24] *See, e.g.*, 167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ("This committee is illegitimate.  It has violated its own rules of creation.  It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6.  You can't have a committee to find out what happened because you are interested.  You can't do that.  And that is what they are doing today.") (statement of Rep. Biggs); *id.* at H7786 (contending that the Select Committee does not comply with H. Res. 503 because "the committee has zero members appointed in consultation with Leader McCarthy" and "it doesn't have 13 members") (statement of Rep. Banks); *see also* 168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) (specifically raising challenges to the Select Committee's means of operation before the full House during its debate over whether the House should adopt a contempt resolution relating to Peter Navarro and

approved the Select Committee's referrals of those four individuals for contempt of Congress.[25]

The interpretive arguments Plaintiffs now present have thus been rejected by the Select

Committee, the Rules Committee, the Parliamentarian, the Speaker, and the full House of

Representatives.  The full House's ratification of the referrals reinforces that Plaintiff's

objections to the Select Committee's composition cannot be accepted.

    In rejecting the argument that House rules mandated that the Speaker had to appoint

thirteen Members to the Select Committee, Judge Kelly further explained that the fact "that

[House Resolution 503 § 2(a)] states that Speaker Pelosi 'shall' appoint thirteen members to the

Select Committee is not conclusive as to whether thirteen members are required for it to lawfully

operate."  *RNC*, 2022 WL 1294509, at *15.  Judge Kelly concluded that if he accepted the

argument (which is identical to Plaintiffs' argument) about the Select Committee's composition,

he "would be 'interpret[ing] the Rule differently than … the [House] itself' and 'would

effectively be making the Rules—a power that the Rulemaking Clause reserves to each House

alone.'"  *Id.* (quoting *Rostenkowski*, 59 F.3d at 1306-07).[26]

_____

Daniel Scavino, Jr.); 167 Cong. Reg. H5760 (daily ed. Oct. 21, 2021) (arguing, in debate on the
contempt resolution for Steve Bannon, that "the subpoenas that have so far been issued do not
ask for information that would meet any legitimate legislative  purpose") (statement of Rep.
Banks).

    [25] *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021)
(Meadows); H. Res. 1037, 117th Cong. (2022) (Navarro and Scavino).  These resolutions were
reported by the Select Committee, approved for floor consideration by the House Rules
Committee and approved by the full House.  *See* 167 Cong. Rec. H5768-69 (daily ed. Oct. 21,
2021) (vote on Bannon); 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (vote on
Meadows); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) (vote on Navarro and Scavino).

    [26] In *RNC*, the court described the Speaker's consultations with Minority Leader
McCarthy: "House Minority Leader Kevin McCarthy recommended five more members to
Speaker Pelosi: Representative Jim Banks (to serve as Ranking Member) along with
Representatives Rodney Davis, Jim Jordan, Kelly Armstrong, and Troy Nehls.  Speaker Pelosi

Before the decision in *RNC*, two other district courts had rejected the same challenge that Plaintiffs bring here concerning the composition of the Select Committee.  In *Budowich v. Pelosi,* Judge Boasberg held that courts must "defer to Congress in the manner of interpreting its rules," and that it would be "usurping Congressional authority" to hold that the Select Committee was not validly composed.  Oral Arg. Tr. at 34, *Budowich v. Pelosi*, No. 21-3366 (D.D.C. Jan. 20, 2022), ECF No. 27.

Shortly thereafter, Judge Carter of the Central District of California agreed with Judge Boasberg, likewise recognizing the deference owed to the Speaker, the full House, and the Select Committee in interpreting a House resolution.  As Judge Carter explained, "[a] court may interpret internal congressional rules only when such interpretation 'requires no resolution of ambiguities.'"  Order Denying Pl.'s Mot. for Prelim. Inj. at 9 n.12, *Eastman v. Thompson*, No. 8:22-00099 (C.D. Cal. Jan. 25, 2022), ECF No. 43 (quoting *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995)).  The same deference applies here, and it forecloses Plaintiffs' arguments.

*Second*, Plaintiffs complain that, "of those nine members Speaker Pelosi has appointed, none of them was appointed after consultation with the minority member [*sic*], as is required by the authorizing resolution."  First Am. Compl. ¶ 56; *see also id.* ¶ 52 (noting that "[n]one of

---

agreed to appoint Representatives Davis, Armstrong, and Nehls but declined to appoint Representatives Banks and Jordan, and she asked Minority Leader McCarthy to recommend two other members.  That same day, Minority Leader McCarthy decided to withdraw all five of his recommended appointees in protest."  2022 WL 1294509, at *2 (citations omitted).  Following the Minority Leader's failure to continue the consultation process, the Speaker interpreted and applied Resolution 503 and House Rules consistent with House precedents, as outlined herein.  As indicated, the Constitution's Rulemaking Clause leaves no doubt that judicial deference to this application of Resolution 503 is required.  *See also* Defs' Mot. for Summ. J. at 7-8, 17-25, *Meadows v. Pelosi*, No. 21-3217 (D.D.C. Apr. 22, 2022), ECF No. 15.

these members was appointed from the selection of five GOP Congresspersons put forth by Republican Minority Leader Kevin McCarthy.").

But the power to appoint Members to select committees rests exclusively with the Speaker of the House.  *See* House Rule I.11 ("The Speaker shall appoint all select, joint, and conference committees ordered by the House."); 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (authorizing Speaker to "accept resignations and to make appointments authorized by law or by the House"); *see also* 8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172 (citing "[i]nstances in which the majority declined to recognize minority recommendations for committee assignments.").

House Resolution 503 is not to the contrary.  When creating the Select Committee, the House only required that Members be chosen "after *consultation* with the Minority Leader," H. Res. 503, § 2(a) (emphasis added), which allows the Speaker greater authority regarding the appointment of minority party Members.  *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) ("Consultation" means to "seek[] advice or information of.'") (internal quotation marks omitted); *Consultation*, Black's Law Dictionary (11th ed. 2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone").

Had the House intended a binding role for the Minority Leader, it could have provided for such a requirement, as it has in the past.  *See* H. Res. 6, 116th Cong. § 104(f)(1)(B) (2019) (Select Committee on the Climate Crisis required that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader"); *id.* at § 201(b)(3) (same requirement for Select Committee on the Modernization of Congress).  Similarly, had the House wanted to delegate appointment power directly to the Minority Leader, it could have done so, as

it also has in the past.  *See*, *e.g.*, H. Res. 24, 110th Cong. § 2(a) (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

Here, House Resolution 503 was followed: the Minority Leader *was* consulted, *see supra* at 8.  The fact that the Speaker—using the authority provided to her by the House Rules; the January 4, 2021, Order of the House; and House Resolution 503—made different selections as to two Members, and that the Minority Leader subsequently withdrew his recommendations, does not make the Select Committee improperly constituted, nor does it invalidate any of its actions.

## III.   The Subpoenas Are Not Overly Broad or Beyond the Scope of the Select Committee's Jurisdiction

Congress's broad power of investigation is firmly established.  The Supreme Court has confirmed that "the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function."  *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).  "This power, deeply rooted in American and English institutions, is indeed co-extensive with the power to legislate."  *Quinn v. United States*, 349 U.S. 155, 160 (1955).  "Without the power to investigate . . . Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively."  *Id.* at 160-61.  This "broad" and "indispensable" power "encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them."  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (internal quotation marks omitted).

Plaintiffs argue that House Resolution 503 is "overly broad" and that "[t]he Verizon Subpoena dates are a violation of" that resolution.  First Am. Compl. ¶ 59.  Plaintiffs' sole example of the alleged overbreadth of House Resolution 503 is that it "address[es] even the

coronavirus pandemic." *Id.* This appears to refer to one of several "Whereas" clauses at the beginning of the Resolution, about ongoing threats in the wake of January 6th:

> Whereas, on January 27, 2021, the Department of Homeland Security issued a National Terrorism Advisory System Bulletin that due to the "heightened threat environment across the United States," in which "[S]ome ideologically-motivated violent extremists with objections to the exercise of governmental authority and the presidential transition, as well as other perceived grievances fueled by false narratives, could continue to mobilize to incite or commit violence." The Bulletin also stated that—

> (1) "DHS is concerned these same drivers to violence will remain through early 2021 and some DVEs [domestic violent extremists] may be emboldened by the January 6, 2021 breach of the U.S. Capitol Building in Washington, D.C. to target elected officials and government facilities."; and

> (2) "Threats of violence against critical infrastructure, including the electric, telecommunications and healthcare sectors, increased in 2020 with violent extremists citing misinformation and conspiracy theories about COVID-19 for their actions."

H. Res. 503 at 1-2. Plaintiffs do not (and cannot) provide any argument as to why this language makes the Resolution overly broad, or even suggest that it has any application to the subpoenas in question. As the D.C. Circuit recently noted, "Congress's power to obtain information is broad and indispensable, and encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Trump*, 20 F.4th at 24.

Furthermore, the subpoena dates—from November 1 to January 31—are entirely consistent with the scope of that Resolution. The January 6th attack did not materialize out of thin air. It was the culmination of months of efforts to delegitimize the results of the presidential election—an effort that began before the November 3, 2020, election even took place. *See, e.g.,* Barton Gellman, *The Election That Could Break America,* The

Atlantic, (Sept. 23, 2020).[27]   The attack would not have occurred absent the massive

efforts to undermine the election results in the two months following Election Day.

House Resolution 503 therefore established the Select Committee "[t]o investigate and

report upon the facts, circumstances, and *causes* relating to the January 6, 2021, domestic

terrorist attack upon the United States Capitol Complex."  H. Res. 503 § 3(1) (emphasis

added); *see also id.* § 4(a)(1).  Looking back to November 1, as these subpoenas do, is in

no way beyond the scope of the Resolution.  Likewise, looking forward to January 31 is

appropriate to investigate whether any communications in the wake of the attack shed

any light on its "facts, circumstances, and causes."  *Id.*

## IV.    The Subpoenas Do Not Violate the Fourth Amendment

Plaintiffs' argument that the subpoenas violate the Fourth Amendment because they are

"so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee,"

First Am. Compl. ¶ 83, is mistaken.  A subpoena is not impermissibly overbroad if its call for

documents or testimony is within the scope of the Congressional inquiry at issue.  *See McPhaul*

*v. United States*, 364 U.S. 372, 382 (1960).  The Select Committee's inquiry includes examining

the January 6th attack as well as its "circumstances" and "causes," to inform a consideration of

"changes in law, policy, procedures, rules, or regulations."  H. Res. 503 § (3)(1), 4(c).  Given

that scope, the subpoena is appropriately tailored to meet the Select Committee's mandate and is

not impermissibly broad.  *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 509 (1975).

Because the seeds of the January 6th attack were planted months earlier, it is entirely appropriate

to examine records dating back to November.

---

[27] *Available at* https://perma.cc/HW2H-YM5Q.

Plaintiffs improperly rely on the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  *See* First Am. Compl. ¶ 79.  *Carpenter*, by its own terms, does not apply to the records the subpoena seeks.  In that case, the Supreme Court faced the question of whether the Government's collection of historical cell-site location information ("CSLI") from a third-party telecommunications company constituted a "search" under the Fourth Amendment.  138 S. Ct. at 2211.  The Court had previously held in *Smith v. Maryland*, 442 U.S. 735 (1979), that recording the numbers that a particular phone number dialed did not constitute a search because, among other reasons, such records were voluntarily disclosed to the phone company and thus there was no reasonable expectation of privacy in them.  *Id.* at 743-44.

In *Carpenter,* although historical CSLI data was in the possession of a third-party telecommunications company, the Court "decline[d] to extend" *Smith* to historical CSLI, "[g]iven the unique nature of cell phone *location* records" and their ability to "achieve[] near perfect surveillance."  *Carpenter*, 138 S. Ct. at 2217-18 (emphasis added).  In particular, the Court distinguished historical CSLI from the "limited capabilities of a pen register," which consisted of "telephone call logs [that] reveal little in the way of 'identifying information.'"  *Id.* at 2219 (citation omitted).

The Verizon subpoenas seek only subscriber information, connection records, and records of session times and durations.  *See* First Am. Compl. Ex. A at 4.  They do not seek historical CSLI or the contents or substance of any communications.  *See id.*  The records sought by the Select Committee, therefore, are governed squarely by *Smith*, not *Carpenter*.  *See*

*Carpenter*, 138 S. Ct. at 2210 (stating that decision is a "narrow one" that "does not disturb the application of *Smith*").[28]

Courts addressing suppression motions after *Carpenter* have consistently held that the decision does not apply to the kinds of records sought here, such as subscriber information and call-detail records.  *See, e.g.*, *United States v. Beverly*, 943 F.3d 225, 239 (5th Cir. 2019) (holding *Carpenter* does not apply to subscriber information and call-detail records and declining to assume that such records may be used to track location); *United States v. Searcy*, No. CR 19-135, 2021 WL 3616062, at *5 (W.D. Pa. Aug. 16, 2021) ("Except for CSLI . . . Mr. Searcy has no legitimate expectation of privacy in information he voluntarily turns over to third parties[.]") (internal quotation marks and citation omitted); *Brown v. Sprint Corp. Sec. Specialist*, No. 17-CV-2561, 2019 WL 418100, at *4 (E.D.N.Y. Jan. 31, 2019) (holding *Carpenter* does not apply to subscriber and call-detail records).

Thus, *Carpenter* simply does not apply to the third-party Verizon subpoena here, and the Verizon subpoena does not violate Plaintiffs' Fourth Amendment rights.

## V.     The Stored Communications Act Does Not Limit the Select Committee's Authority to Obtain Non-Content Information from Verizon Pursuant to a Lawful Subpoena

Plaintiffs assert in passing that the Select Committee's subpoenas to Verizon violates the Stored Communications Act, 18 U.S.C. § 2701 *et seq*., but they make no attempt to explain how. *See* First Am. Compl. at 4; *see also id.* ¶ 14, p. 18 (Count III header), and Prayer for Relief ¶ c.

---

[28] Plaintiffs attempt to elide the distinction between historical CLSI and other phone records that are governed by *Smith*, alleging that the subscriber and call-detail records "*can* be used for historic mobile site analysis." First Am. Compl. ¶¶ 64, 74 (emphasis added).  But so can the phone number itself—law enforcement could simply request historical CSLI from a telecommunications carrier for a particular phone number.  The additional subscriber and call-detail information would not provide any additional mechanism for obtaining historical CSLI or evading the warrant requirement set forth in *Carpenter*.

That claim—even assuming it is properly made—is wrong as a matter of law.  Nothing in the Act limits the ability of a Congressional committee to obtain non-content information from a "person or entity providing an electronic communication service to the public" via a lawful, duly authorized subpoena.  18 U.S.C. § 2702(a)(1).

The Stored Communications Act contains no restrictions on Congress obtaining non-content records through a Congressional subpoena.  The Act generally allows disclosure of non-content records, although it prohibits (with one exception) voluntary disclosure of non-content records to "governmental entit[ies]."  18 U.S.C. § 2702(a)(3), (c)(4).  The definition of the term "governmental entity," as used in the Act, does not include Congress.  *Id.* §§ 6, 2711(4).  And the Act expressly *permits* disclosure to "any person other than a governmental entity."  *Id.* § 2702(c)(6).

The statute's definitional terms make clear that Congress did not intend for the phrase "governmental entity" to include Congress.  *See Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) ("'When a statute includes an explicit definition, we must follow that definition,' even if it varies from a term's ordinary meaning.").  The Act defines "governmental entity" as "a department or agency of the United States or any State or political subdivision thereof."  18 U.S.C. § 2711(4).  The terms "department" and "agency" have particular meanings in Title 18, as defined in Section 6.  That provision defines "department" as "one of the *executive* departments enumerated in section 1 [now § 101] of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government."  *Id.* § 6 (emphasis added).  It likewise defines "agency" as "any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that

such term was intended to be used in a more limited sense." *Id.* The Select Committee is neither an executive department nor a governmental agency, and no "context" in the Stored Communications Act suggests that those terms apply to Congress.

The Supreme Court addressed a similar issue of statutory interpretation regarding the phrase "any department or agency of the United States" in *Hubbard v. United States*, 514 U.S. 695 (1995). That case concerned the applicability of 18 U.S.C. § 1001, forbidding making false statements to "any department or agency of the United States," to the Judicial Branch. *Id.* at 698. The Court noted initially that the definitions in Section 6 presumptively applied to "all of Title 18," including Section 1001. *Id.* at 700. The Court stated it was "incontrovertible" that "agency" did not refer to any court within the Judicial Branch. *Id.* The Court further concluded that nothing in the context of Section 1001 "shows that" the term "department" was intended to apply beyond the Executive Branch. *Id.* (quoting 18 U.S.C. § 6). The Court stated that there is "nothing in the text of the statute, or in any related legislation, that even suggests—let alone 'shows'—that the normal definition of 'department' was not intended." *Id.* at 701.[29]

As in *Hubbard*, the SCA's definition of "governmental entity" and the definition contained in Section 6 make plain that the term "governmental entity" does not apply to Congress. There is nothing in the Act that even suggests, let alone "shows," that Congress

---

[29] *Hubbard* overruled *United States v. Bramblett*, 348 U.S. 503 (1955), which held that the statute applied to false statements made to the Legislative Branch. 514 U.S. at 715. The *Hubbard* Court stated that *Bramblett* "erred by giving insufficient weight to the plain language of §§ 6 and 1001," resulting "in a decision that is at war with the text of not one, but two different Act of Congress." *Id.* at 703, 708. After the ruling in *Hubbard*, Congress amended the statute at issue, 18 U.S.C. § 1001. *See* False Statements Accountability Act of 1996, Pub. L. No. 104-292 § 2.

intended to include itself in the definition.  Moreover, the statute contains other provisions that further reinforce this plain meaning.

The Act provides that in the case of willful or intentional violations, the "head of the department or agency" in which the violation occurred may subject the violator to administrative discipline.  18 U.S.C. § 2712(c).  But the leadership of Congress and its committees do not constitute a "head" of an agency or department.  As the Supreme Court long ago established, "[t]he term 'head of a department' means . . . the Secretary in charge of a great division of the *executive branch* of the government, like the State, Treasury, and War, who is a member of the Cabinet."  *Burnap v. United States*, 252 U.S. 512, 515 (1920) (emphasis added); *see also Trump v. Deutsche Bank AG*, 943 F.3d 627, 642 (2d Cir. 2019) (holding that use of term "head of the agency or department" indicated Congress did not intend Right to Financial Privacy Act to apply to Congressional committee), *vacated on other grounds by Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020); *see also* Aaron R. Cooper, *Congressional Surveillance*, 70 Am. U. L. Rev. 1799, 1825-34 (2021) (surveying statutory text, context, and legislative history and concluding that in the Stored Communications Act Congress intended to exempt itself from the term "governmental entity").

Accordingly, the plain text of the Stored Communications Act, as well as the overall context and structure of the statute, make clear that Congress is not a "governmental entity" as that term is defined in the Act.  As a result, because the Act expressly permits disclosure of non-content records to "any person other than a governmental entity," 18 U.S.C. § 2702(c)(6), the statute cannot be read to prohibit their disclosure to the Select Committee.

## VI.    The Subpoenas Do Not Violate the First Amendment

Plaintiffs' argument that the subpoenas to Verizon violate their First Amendment rights is squarely foreclosed by *Eastland*, 421 U.S. at 509-10.  There, the Supreme Court rejected an

24

organization's argument that a Congressional subpoena's purpose was to "'harass, chill, punish, and deter' [it] in the exercise of [its] First Amendment rights," explaining that the typical First Amendment balancing test "plays no part" when a Congressional subpoena is involved.  *Id.* at 509 n.16.  Here, too, Plaintiffs' First Amendment arguments against enforcement of the Select Committee's subpoena must be rejected.

Even if their claim were subject to a balancing test, it would still fail: the balancing of "the competing private and public interests at stake" here plainly favors the Select Committee. *Barenblatt v. United States*, 360 U.S. 109, 126 (1959).  This Court has rejected claims that issuance of a Congressional subpoena violates a respondent's First Amendment rights.  *See Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 138 (D.D.C. 2016), *aff'd*, 856 F.3d 1080 (D.C. Cir. 2017).  That conclusion is entirely consistent with the Supreme Court's recognition that the public interest is extremely high when the focus is on ensuring "the free functioning of our national institutions."  *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (internal quotation marks omitted).  The Select Committee is doing precisely that by seeking the records at issue here.  Any previous cooperation by Mr. Alexander with other Select Committee requests does not diminish its interest in obtaining a full picture of his involvement in the events under investigation.

Plaintiffs fail to assert any First Amendment interest that could outweigh the very grave public interest here.  Their assertions that their associational rights would suffer infringement, *see* First Am. Compl. ¶¶ 97-98, do not suffice to make out a First Amendment claim.  *See Buckley*, 424 U.S. at 74 (showing an associational injury requires demonstrating a "reasonable probability that the compelled disclosure . . . will subject them to threats, harassment, or reprisals from either Government officials or private parties"); *Brock v. Loc. 375, Plumbers Int'l Union of*

25

*Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988) (reviewing case law and noting that courts have "emphasized in each of those decisions . . . the need for objective and articulable facts, which go beyond broad allegations or subjective fears . . . . [A] merely subjective fear of future reprisals is an insufficient showing of infringement of associational rights.").

Assuming for purposes of argument that Plaintiffs were able to substantiate a legitimate interest implicated by the Subpoena, it is outweighed by the Select Committee's "uniquely weighty interest in investigating the causes and circumstances of the January 6th attack." *Trump*, 20 F.4th at 24. Here, the Select Committee's subpoena seeks records relevant to determining the root causes of the violent January 6th attack on Congress itself and the constitutional responsibility to officially count Presidential electoral votes. To determine the extent of Mr. Trump's and his campaign's efforts to implement the planning for the violent attack and the attack itself, the Select Committee requires a record of relevant communications. This is a paradigmatic example of the governmental interest in the "free functioning of our national institutions." *Buckley*, 424 U.S. at 66. Accordingly, Plaintiffs' First Amendment claim fails.[30]

## CONCLUSION

For the reasons stated above, this Court should dismiss the Complaint in its entirety.

---

[30] Plaintiffs' allegations that the Select Committee's true purpose in issuing the subpoenas is to "build[] an opposition research file for the 2022 election cycle," First Am. Compl. ¶ 109, and to "chill the speech of the Select Committee Members['] political adversaries," *id.* ¶ 113, are both completely false and not judicially cognizable: "so long as Congress acts in pursuance of its constitutional power . . . the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Ferrer*, 199 F. Supp. 3d at 143 (quoting *Barenblatt*, 360 U.S. at 132-33).

Respectfully submitted,

/s/  *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

John A. Freedman[*]
Paul Fishman[*]
Amy Jeffress[*]
David J. Weiner[*]
John M. Hindley[*]
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington,  D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com
David.Weiner@arnoldporter.com
John.Hindley@arnoldporter.com

SHER TREMONTE LLP
Justin M. Sher[*]
Michael Tremonte[*]
Noam Biale[*]
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com

27

MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

Dated: May 24, 2022

* Appearing pursuant to 2 U.S.C. § 5571(a).

**CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2022, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Columbia, which I understand caused a copy to be served on all registered parties.

*/s/ Douglas N. Letter*___
Douglas N. Letter