**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

ALI ALEXANDER, *et al.*

                           *Plaintiffs*,

      v.

NANCY PELOSI, *et al.*


                           *Defendants*.

No. 1:21-cv-03308-CJN

## <u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO CONGRESSIONAL DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ......................................................................................................1

BACKGROUND .........................................................................................................3

ARGUMENT ..............................................................................................................9

I.   PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE
     VERIZON SUBPOENAS WERE NOT VALIDLY ISSUED BY A DULY
     AUTHORIZED COMMITTEE, AND THUS WERE *ULTRA VIRES*....................................9

II.  THE PLAINTIFFS HAVE ALLEGED A PLAUSIBLE CLAIM THAT THE SELECT
     COMMITTEE DOES NOT HAVE A VALID LEGISLATIVE PURPOSE AND THUS
     THE SUBPOENAS ARE OVERLY BROAD AND BEYOND THE PROPER SCOPE OF
     THE COMMITTEE. ...........................................................................................13

III. PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE RELEASE OF THEIR
     PHONE RECORDS VIOLATE THE FOURTH AMENDMENT. .......................................16

IV.  PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM UNDER THE STORED
     COMMUNICATIONS ACT AND 47 U.S.C. § 222(c)(1)......................................18

     A.  Plaintiffs have alleged "sufficient factual matter, accepted as true, to
         'state a claim to relief that is plausible on its face'," under the Stored
         Communications Act, 18 U.S.C. § 1039(b).........................................19

     B.  Plaintiffs have alleged "sufficient factual matter, accepted as true, to
         'state a claim to relief that is plausible on its face'," under the
         Communications Act of 1934, as amended, 47 U.S.C. § 222(c)(1). ................21

V.   PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE
     SUBPOENAS FOR THEIR PHONE RECORDS VIOLATE THE FIRST
     AMENDMENT. ...............................................................................................27

CONCLUSION..........................................................................................................29

CERTIFICATE OF COMPLIANCE AND SERVICE..............................................   30

DECLARATION OF CHRISTINE TORRE

## TABLE OF AUTHORITIES[1]

**Constitutional Provision:**

*First Amendment, U.S. Const. ...................................................................................... 3, 18, 27

*Fourth Amendment, U.S. Const. ..................................................................................... 3, 16, 18

Tenth Amendment, U.S. Const. ......................................................................................... 22

**Cases:**

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n,* 333 F.3d 168
(D.C. Cir. 2003) ................................................................................................................. 28

*\*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 3, 19, 29

*Ass'n of Am. Railroads v. Castle,* 562 F.2d 1310 (D.C. Cir. 1977) ............................... 10

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............................................................................... 28

*Black Panther Party v. Smith*, 661 F.2d 1243 (D.C. Cir. 1981) ..................................... 28

*\*Carpenter v. United States,* 138 S. Ct. 2206 (2018) .................................................... 16, 17, 26

*\*Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539 (1963). ............... 27, 29

*Gutierrez de Martinez v. Lamagno,* 515 U.S. 417 (1995) ............................................... 12

*Hubbard v. United States,* 514 U.S. 695 (1995) .............................................................. 23, 24

*Katz v. United States*, 389 U.S. 347 (1967) .................................................................... 16, 20

*Liveright v. United States,* 347 F.2d 473 (D.C. Cir. 1965) ............................................. 9

*McGrain v. Daugherty,* 273 U.S. 135 (1927) .................................................................. 9

*McPhaul v. United States*, 364 U.S. 372 (1960) .............................................................. 17, 21

*\*Meadows v. Pelosi,  Reply Brief No.*21-CV-3217 (CJN) (D.D.C.) (ECF 38) ............... 13

---

[1] Authorities chiefly relied on are marked with asterisks.

*Mesa Air Group, Inc. v. Department of Transp.*, 87 F.3d 498
(D.C. Cir. 1996) .................................................................................. 24

*\*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ............................... 27, 28

*New York v. United States*, 505 U.S 144 (1992)) ........................................... 24

*NFIB v. Sebelius*, 567 U.S. 519 (2012) ...................................................... 22

*Oklahoma Press Pub. Co.  v. Walling,* 327 U.S. 186 (1946) ................................ 16, 20

*Quinn v. United States,* 349 U.S. 155 (1955) ............................................... 14

*Republican National Committee. v. Pelosi ("RNC"),* No. 22-659 (D.D.C.) ................ 11, 12, 13

*Republican National Committee v. Nancy Pelosi et al.,* No. 22-5123, Order
(D.C. Cir. May 24, 2022) ..................................................................... 13

*Republican National Committee v. Nancy Pelosi et al.*, No. 22-5123, Order
(D.C. Cir. May 25, 2022) ..................................................................... 11

*\*Republican National Committee v. Nancy Pelosi et al.,* Civil Case
No. 22-00659) ............................................................................... 11

*Shelton v. United States,* 327 F.2d 601 (D.C. Cir. 1963) ................................. 10

*Samaritan Health Ctr. v. Heckler,* 636 F. Supp. 503 (D.D.C. 1985) ....................... 10

*Trump v. Mazars USA, LLP,* 940 F.3d 710 (D.C. Cir. 2019) ................................. 14

*\*Trump v. Mazars USA, LLP,* 140 S. Ct. 2019 (2020) ...................................... 14, 16, 21

*United States of America v. Steven K. Bannon*, Crim. Action No. 21-00670-RJN (D.D.C)… 10,

*United States v. Heth,* 7 U.S. (3 Cranch) 399 (1806) ..................................... 24

*Watkins v. United States,* 354 U.S. 178 (1957) ........................................... 14

*\*Yellin v. United States,* 374 U.S. 109 (1963) .......................................... 9

**Statutes:**

18 U.S.C. § 6 (Department and agency defined) ............................................ 24

18 U.S.C. § 1001 (Statements or entries generally) ....................................... 24, 25

*18 U.S.C. § 1039(B) ............................................................................ 18, 21, 27

18 U.S.C. § 2702 (Voluntary disclosure of customer communications or records) ................................................................................................ 22, 23

*18 U.S.C. § 2711 (Definitions for chapter)............................................... 18

*Stored Communications Act (Pub.L. 99–508; 100 Stat. 1848, 1860; 18 U.S.C. §§ 2701–2712). ................................................................................. 18, 22

*47 U.S.C. 222 (Privacy of customer information). ................................ 18, 19, 26, 27

**Other Authorities:**

Danielle Brian, Letter to January 6 Committee Supporting Careful Use of Subpoena Authority (October 5, 2021) https://www.pogo.org/letter/2021/10/letter-to-january-6-committee-supporting-careful-use-of-subpoena-authority .......................................................... 28

Aaron R. Cooper, Congressional Surveillance, 70 Am. U. L. Rev. 1799, 1833 (2021)............. 23

 Alexandra Dukakis, "*'Stop the Steal' organizer cooperating with Jan. 6 committee probe, sits for 8-hour interview,*" ABC News, Dec. 9, 2021 (https://abcnews.go.com/US/stop-steal-leader-cooperating-jan-committee-probe-deposition/story?id=81645579 ............................................. 1

Alexandra Dukakis, "*'Stop the Steal' organizer Ali Alexander appears before federal grand jury,*" (ABC News, Jun. 24, 2022).  https://abcnews.go.com/US/stop-steal-organizer-ali-alexander-appears-federal-grand/story?id=85664204 ................................................ 2

David Harsanyi, National Review, *Schumer to Gorsuch and Kavanaugh: Nice Little Court Ya Got There, Hate to See Anything Happen to It*  (March 5, 2020). https://www.nationalreview.com/2020/03/chuck-schumer-attack-on-supreme-court-despicable/ ....................................................................................................... 14

H. Res. 503 117th Cong. (2021) ................................................................. 7, 9 10 13

Restatement (Second) of Contracts, § 206 (1979) ..................................................... 24

## INTRODUCTION

Congressional Defendants open their Memorandum in Support of their Motion to Dismiss Plaintiffs' Amended Complaint ("Def. Mem.") by launching the following false broadside against Plaintiffs for asserting their constitutional rights:

> Once again, persons who tried to overturn an election are attempting to prevent a properly constituted Congressional committee from "investigating the single most deadly attack on the Capitol by domestic forces" and evaluating the need for legislation to "ensur[e] the safe and uninterrupted conduct of [Congress's] constitutionally assigned business." [citations omitted].

> Plaintiff Ali Alexander, who played a key role in setting the stage for the January 6th attacks, and Plaintiff Christine Torre, who appears to share a phone plan with her son Benjamin Torre, an admitted U.S. Capitol intruder, are trying to block a subpoena issued by the House Select Committee to Investigate the January 6th Attack on the United States Capitol (Select Committee) to Verizon Communications Inc. seeking subscriber information, connection records, and records of session times and durations of calls from November 1, 2020, through January 31, 2021, for phone numbers associated with Plaintiffs' Verizon accounts . . . .

Def. Mem. at 1.

The Congressional Democrats' attack misses the mark. In the first place, neither of these named Plaintiffs "tried to overturn an election" any more than Democrats did so when they raised objections to the validity of electors in past elections; instead, they peacefully exercised their First Amendment rights to promote the integrity of the 2020 presidential election.

Second, Plaintiff Alexander is not "once again" blocking subpoenas from the Select Committee. On the contrary, last December, he appeared before the Committee in an eight-hour deposition and provided the Committee with hundreds of documents, including text messages and emails.[1] And last Friday, he appeared again as a fact witness before the Grand Jury in

---

[1] Alexandra Dukakis, "*'Stop the Steal' organizer cooperating with Jan. 6 committee probe, sits for 8-hour interview,*" ABC News, Dec. 9, 2021 (https://abcnews.go.com/US/stop-steal-leader-cooperating-jan-committee-probe-deposition/story?id=81645579).

Washington, D.C., and testified for approximately three hours, essentially repeating his December testimony and providing the same documents.[2]

Third, Plaintiff Alexander not only did not play a "key role" in "setting the stage of the January 6th attacks," he played no role in setting, participating, or encouraging the riots or intrusion of the U.S. Capitol on January 6, 2021.  In fact, Alexander is seen on video attempting to guide misdirected protesters and bystanders away from those who were in conflict with law enforcement.

As for Plaintiff Christine Torre, her involvement in the January 6, 2020, events was that of a volunteer exercising her First Amendment rights to pass out signs, sing patriotic songs, and pray.   Her interest with the Select Committee is that she "appears to share a phone plan with her son Benjamin Torre," who entered and exited the Capitol Building within 15 minutes.  In fact, she does **not** share a phone plan with him and if the Select Committee were at all interested in his phone records, they could have easily subpoenaed them instead of his mother's phone records.   *See* Declaration of Christine Torre (Exhibit 1).  This is further evidence of the abuse of Select Committee's subpoena power.

Plaintiffs' Amended Complaint challenges the Congressional Defendants' subpoenas to Verizon to turn over their phone records to the Select Committee, alleging facts supporting Four Counts.  First, the Verizon subpoenas were not validly issued by a duly authorized committee and thus was *ultra vires*.  Second, the Verizon subpoenas are overly broad and beyond the scope

---

[2] Alexandra Dukakis, "*'Stop the Steal' organizer Ali Alexander appears before federal grand jury,"* (ABC News, Jun. 24, 2022).  https://abcnews.go.com/US/stop-steal-organizer-ali-alexander-appears-federal-grand/story?id=85664204.

of the committee's jurisdiction.  Third, the Verizon subpoenas violate the Fourth Amendment

and the Stored Communications Act.  Fourth, the Select Committee is a federal government body

actively abridging Plaintiffs' First Amendment rights, and setting a chilling effect on the exercise

of those rights.  Since the Third Count covers both a statutory and constitutional claim, they will

be addressed below separately, as they were by the Congressional Defendants.[3]

As will be demonstrated, Plaintiffs have alleged "sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face'," to survive Congressional

Defendants' Motion to Dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This is the standard of review offered by the

Congressional Defendants, Def. Mem. at 9-10, and the standard that Plaintiffs easily meet.

Accordingly, Plaintiffs urge this Court to deny Congressional Defendants' Motion to Dismiss.

## BACKGROUND

Plaintiffs take strong exception to Congressional Defendants' mischaracterization of the

extent of Plaintiff Alexander's involvement in the events of January 6, 2022:

> January 6th was the culmination of months of organized attacks on the legitimacy of the
> 2020 presidential election and false claims about its winner.  Plaintiff Ali Alexander was
> directly involved in these events as a founder and leader of "Stop the Steal," an
> organization that arranged numerous rallies across the country and maintained the
> websites "StopTheSteal.us" and "WildProtest.com."

Def. Mem. at 2.

Mr. Alexander had neither planned a January 6th event(s), nor planned even to be in

Washington, D.C., on that date until approximately December 16th or so.  January 6th was not

"months of organized attacks" in the making, and in any event not with Alexander's

---

[3] Congressional Defendants' Argument section is numbered II-VI.  Plaintiffs assume they are
making only five arguments not six, although there were Error notations in their corresponding
Table of Contents.

participation.  He was wholly unaware of the importance of the January 6th date prior to the

second half of December 2020.  Alexander's peaceful and lawful protests, not "organized

attacks," which took place in several places around the country -- all without incident, did not

have January 6th in mind or as a goal.  Yet Congressional Defendants claim:

> Mr. Alexander organized, and advertised on StopTheSteal.us, rallies in
> Washington, D.C., on November 14 and December 12 to protest the results of the
> Presidential election. . . .  Members of the Proud Boys extremist group clad in their
> distinctive black-and-yellow garb were photographed by the press among the November
> 14 rallygoers. . . .  After thousands of Trump supporters rally in D.C., violence erupts
> when night falls.  According to press reports, while much of the day was peaceful,
> clashes occurred between rallygoers and counter-protesters. . . . After nightfall, more
> serious violence broke out, and at least 20 individuals were arrested. . . .

Def. Mem. at 3.

Again, the November 14 and December12 events were peaceful, permitted protests that

took place in Washington D.C., with Alexander's participation, and which did not have January

6th as a goal or even in his mind and had nothing to do with any violence that broke out in the

evening.  Alexander did not coordinate with the Proud Boys for either of these events, or his

lawfully permitted January 6th event, which were not part of any lawbreaking or mischief.  Yet

Congressional Defendants claim:

> The December 12 rally was even more violent, leading to the arrests of 39 people
> for protest-related activities. . . .  Eight police officers were injured, four people were
> stabbed, and four churches were vandalized.  *See id*.  According to District of Columbia
> officials, members of the Proud Boys organization who refused to accept the results of
> the Presidential election sparked the violence.

Def. Mem. at 3.

This is false.  Alexander participated in hosting a December 12 prayer rally with

conservative, Christian, and Jewish groups. The event was not violent, and had no incidents

which involved either conflict or required police action.  The event was lawfully permitted.  The

Defendants are seeking to use guilt by association by using alleged events that had no

4

participation or sanction from or by Alexander, who finds it offensive as a man of the ministry

and of God, any suggestion that he was involved in any way with the vandalization of houses of

worship. yet Congressional Defendants claim:

> On December 19, 2020, former President Trump tweeted the following: "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!" . . . . The WildProtest.com website then posted this: "We the People must take to US Capitol lawn and steps and tell Congress #DoNotCertify on #JAN6! Congress cannot certify this fraudulent Electoral College. Our presence in Washington D.C. will let Members of Congress know that we stand with Rep. Mo Brooks and his colleagues in the House of Representatives who will bravely object to the certification of the Electoral College." The website heading was "PRESIDENT TRUMP WANTS YOU IN DC JANUARY 6."

Def. Mem. at 3-4.

Alexander did not coordinate with President Donald J. Trump on his December 19, 2020

tweet. Alexander launched a website days later that played on the President's universally

accessible public tweet. Alexander's speech is protected by the First Amendment and

acknowledges the legal process in objecting to the electoral votes. This process was attempted by

Democrats in the 2001, 2005, and 2017 election certifications. Republicans were simply using

that same process in 2021 with the support of Alexander as a citizen and conservative thought

leader. Alexander anticipated no violence, believing that the full power of the U.S. federal

government's ability to monitor and mitigate threats to his supporters, officials, or the general

public, as was done at prior gatherings in Washington, D.C. Yet Congressional Defendants

claim:

> In a December 28, 2020 video, Mr. Alexander claimed "I'm the guy who came up with the idea of January 6th when I was talking with Congressman [Paul] Gosar, Congressman Andy Biggs, and Congressman Mo Brooks" in order to "build momentum and pressure" on Members of Congress who would be loath to oppose "that mob." *See* Andrew Kaczynski and Em Steck, Videos show 'Stop the Steal' rally organizer saying he would work with extremist groups, CNN (Jan. 22, 2022).9 In a December 23, 2020 video,

he said that he would "talk to the Proud Boys" and "talk to the Oath Keepers" to arrange for security on January 6.  *See id.*

Def. Mem. at 4 (footnote omitted).

On December 9, 2021, Alexander truthfully and fully answered questions before the Select Committee about any interactions with Members of Congress. He also explained to the Committee that he had not coordinated with the Proud Boys. All records supplied to the Select Committee in response to the subpoena validate Alexander's testimony.  Alexander did agree to allow some veterans who were also members of the Oath Keepers organization to volunteer as ushers for his event.  He had heard no claims of extremism or reason to believe anything nefarious.

As will be demonstrated, the Verizon subpoena at issue has no limits, exceeds pertinence, and is not limited to those interactions that he might have been with other targets of the Committee—which there is no evidence to suggest exists—it sweeps up all of Alexander's personal, ministerial, and professional network as well.  It bypasses Alexander's privilege log, lodged with the Committee.  This is a workaround that is, in essence, violating the letter and spirit of the law and constitutional protections afforded to citizens in the United States of America.  Yet Congressional Defendants claim:

> Mr. Alexander also organized a rally on the U.S. Capitol grounds scheduled for January 6, 2021. *See* First Am. Compl. ¶ 3. He advertised on one of his websites11 that the event would take place from 10:00 A.M. until 5:00 P.M. and sought a permit for 50 people under the name of the organization "One Nation Under God." *See id.*; Thompson Letter at 2.

> According to press reports, in the weeks before the January 6th attack, Mr. Alexander made repeated references at Stop-the-Steal-sponsored events to the possible use of violence to achieve the goals of the organization. . . .At a D.C. rally the day before the attack, Mr. Alexander reportedly led the crowd in a chant of "victory, or death."  Thompson Letter at 2.

> Mr. Alexander is reported to have claimed to have been in communication with the White House and Members of Congress regarding events planned to

6

coincide with the certification of the 2020 Electoral College results. . . .  Among the "Invited Speakers & Featured Guests" advertised on his website for his January 6th event were Roger Stone, Representative Paul Gosar, Representative Marjorie Taylor Greene, and Representative Lauren Boebert.

Def. Mem. at 5 (citation and footnote omitted).

Alexander's "One Nation Under God" event was permitted and lawful. In fact, his designated lot, "Area 8" remained lawful and peaceful and did not participate in any riot or lawbreaking. Because President Trump planned an event that took shape after Alexander's announced event, times and confirmed speakers changed. This isn't irregular. The Committee attempts, again, to make a criminal conspiracy out of Alexander exercising his First Amendment rights, obtaining permit(s), hiring event planners to coordinate with law enforcement and appropriate officials, and recognizing the legal process for constitutional objections.

The Committee selectively omits excerpts from these same broadcasts where Alexander encouraged and invoked peace and said the protests were designed to encourage politicians to think of their constituents when casting votes.  Alexander even specified that all protests would take place "outside" the Capitol and that votes would be cast "inside" by Members of Congress. Yet Congressional Defendants claim:

> On the morning of January 6th, Mr. Alexander was a "VIP guest" at the Ellipse rally at which President Trump spoke. First Am. Compl. ¶ 3. In his speech, the former president said, "All of us here today do not want to see election victory stolen . . . We will never give up, we will never concede . . . Our country has had enough . . .We will not take it anymore . . . We will stop the steal.". . . .

Def. Mem. at 5–6.

Alexander was a VIP guest at the lawfully permitted Ellipse rally along with many others.  There are no accusations that he communicated with anyone, in undisclosed communications, pertinent to the scope of Committee's Authorizing Resolution (H. Res. 503).   s will be argued, the Committee has a legal requirement to establish that it has a compelling

7

interest in his phone records that outweighs Alexander's presumptive expectation of privacy and civil rights. The Committee cannot establish that because they exceed the scope of their authority, they ask for unrelated information, they have already been supplied with Alexander's relevant communications, and this compulsory process violates any privileges Alexander has or may claim.  Yet Congressional Defendants claim:

> Following the Ellipse rally, Mr. Alexander marched to the Capitol with Alex Jones and others. . . .  There, he witnessed individuals "clashing with police near the Capitol Building" on the building's west side.

Def. Mem. at 6.

Alexander walked from the Ellipse rally toward his permitted "One Nation Under God" permitted event on Area 8 near the Capitol Building, as he testified before the Select Committee. This event was permitted by the U.S. Capitol Police, and was never involved in any "Capitol attack."  Upon heading there, he received news that there was conflict between a few citizens and law enforcement.  Alexander detoured from his route to his event to attempt to be a good Samaritan, and to de-escalate tension between bystanders and police.  Alexander handed over these communications to the Select Committee. There is no reasonable justification for this Court to authorize an unlimited fishing expedition for further inquiry into his personal phone records.

Congressional Defendants' attempts to link news articles and claims, disguised as evidence, that have little to nothing to do with accusations against Alexander is designed to mislead this Court by casting aspersions on Alexander's character with misleading characterizations.  None of this justifies or speaks to the justifications or the scope of the Verizon Subpoena.  It is tantamount to name calling, guilt by association, and seeks to prejudice this Court against Alexander and his civil rights.

**ARGUMENT**

**I.  PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE VERIZON SUBPOENAS WERE NOT VALIDLY ISSUED BY A DULY AUTHORIZED COMMITTEE, AND THUS WERE *ULTRA VIRES*.**

In Count I of their Amended Complaint, Plaintiffs allege that the Verizon subpoenas were not valid because the Select Committee that issued them was not constituted in accordance with H. Res. 503: "Appointment Of Members.—The Speaker **shall appoint 13 Members** to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader."  H. Res. 503 117th Cong. (2021) (emphasis added).  Amend Compl. ¶51.  Speaker Pelosi has appointed only nine members to the Select Committee: seven Democrats and two Republicans.  None of these members was appointed from the selection of five GOP Congresspersons put forth by Republican Minority Leader Kevin McCarthy.  Amend Compl. ¶52.  While authorized congressional committees have subpoena authority implied by Article I of the Constitution, *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927), the Select Committee is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

The Congressional Defendants move to dismiss this Count arguing that Speaker Pelosi has the discretion to appoint any number less than 13 Members to the Committee, whether nine as she did, or five or even one.  *See* Def. Mem. at 10-17.  The Congressional Defendants' citation to other Congressional committees, such as the Katrina Select Committee, that were not fully staffed as constituting precedent in this case, *id*. at 15, is not dispositive since there was no legal challenge to the subpoenas issued by those committees.  *Cf. Yellin v. United States*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting that the Committee be equally meticulous in obeying its own rules."); *Liveright v. United States*, 347 F.2d 473 (D.C. Cir. 1965); *Shelton v. United States*, 327

F.2d 601 (D.C. Cir. 1963).

"The word 'shall' is the language of command," *Ass'n of Am. Railroads v. Castle,* 562 F.2d 1310, 1312 (D.C. Cir. 1977), and carries a mandatory connotation.  On the rare occasions in which courts have found the word's application to be uncertain, the ambiguity arose from its juxtaposition with related provisions (usually of a statute) that were phrased in directory or discretionary terms. *See, e.g., Samaritan Health Ctr. v. Heckler,* 636 F. Supp. 503, 515 (D.D.C. 1985) (finding potential ambiguity "where 'shall' is joined with a phrase that implies discretion").

There is no such obscurity in H. Res. 503. Its instructions that the Speaker *shall* appoint 13 members-five of whom *shall* be selected in consultation with the minority leader-are susceptible to no reasonable interpretation other than what their plain language imparts: the Select Committee *must* be constituted in conformance with H. Res. 503's plain terms.

Subsequent to the filing of the Select Committee's Motion to Dismiss, this Court ruled from the bench on June 15, 2022, against Defendant Steven Bannon's similar argument in his criminal contempt case after oral argument.  In *United States of America v. Steven K. Bannon*, Criminal Action No. 21-00670-RJN (D.D.C.), this Court declined to dismiss the indictment against Mr. Bannon, who had argued, *inter alia*, that:

> [T]he composition of the Select Committee invalidates the subpoena.  As [Bannon] notes, House Resolution 503, the resolution that authorized the Select Committee, provides that, "The Speaker shall appoint 13 members to the Select Committee, -- five of whom shall be appointed after consultation with the minority leader.". . .  Mr. Bannon argues the Speaker rejected the nominees suggested by the minority leader, and the Committee has never operated with 13 members. . . .  Even assuming the truth of Mr. Bannon's contention of there being less than 13 members of the Committee while, of course, those numbers are not in the indictment, the government at least does not dispute them.  It is not a basis by which this Court can or will dismiss the indictment.

*USA v. Bannon*, No. 21-00670, Transcript of June 15, 2022, Hearing, pp. 113-114.

In so ruling, the Court issued this caveat:  "And that is not to say that the argument is

unreasonable.  Indeed, I agree with Judge Kelly, who recently dealt with similar arguments in another case[, *Republican National Committee v. Nancy Pelosi et al.*, Civil Case No. 22-00659,] that this is **'not an unreasonable – position,'** as Judge Kelly put it.  But the Court cannot conclude, as a matter of law, that the Committee was invalidly constituted such that dismissal of the indictment is warranted." *Id.* at 114 (emphasis added).

The reason for this inability to dismiss the indictment, according to the Court, is that:

> [T]he word "shall," although usually mandatory, can sometimes mean "should," "will" or even "may," as the Supreme Court stated in *Gutierrez de Martinez versus Lamagno*.  Though "shall" generally means "must," legal writers sometimes use or misuse "shall" to mean "should," "will" or even "may."  That's a quote from the Supreme Court. . . .And given this potential ambiguity, the Court agrees with Judge Kelly that it must give great weight to the interpretation of those House members charged with implementing the resolution and to the House itself.  This reading, the reading applied by the Speaker, appears to be that in the context of this resolution, and "the Committee shall" means "may or should"; that reading appears to have been **ratified by the full House several times** . . . .  and there would be potential separation of powers issues, should this or any other court reject a congressional interpretation of its own rule. . . .  As such, the Court cannot conclude, as a matter of law, that the composition of the Select Committee renders the Subpoena invalid such that dismissal of the indictment is warranted.

*Id.* at 115-116 (emphasis added).

This Court should not follow Judge Kelly's ruling in *Republican National Committee v. Nancy Pelosi at al.* for at least four compelling reasons.

First, Judge Kelly's ruling in *Republican National Committee*  ("RNC") is pending appeal.  On May 24, 2022, the U.S. Court of Appeals for the District of Columbia Circuit granted RNC's Emergency Motion for Administrative Injunction and Injunction Pending Appeal *Republican National Committee v. Nancy Pelosi et al.*, No. 22-5123, Order (D.C. Cir. May 24, 2022).  Plaintiffs suggest that this Court may hold in abeyance its ruling in the instant case pending disposition of the appeal in *RNC*.

Second, unlike the subpoena in *Bannon,* the Verizon subpoenas have **not** been "ratified"

by the full House which may conclude that such blanket subpoenas to approximately 100 private citizens for their phone records are overbroad or exceed the scope of the Select Committee's authority.  In any event, there is no legal doctrine of ratification of the acts of a committee that has not been duly constituted in the first place.

Third, in *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417 (1995), the case cited by this Court during the Bannon hearing, Justice Ginsburg, writing for the five-justice majority (Justices Stevens, O'Connor, Kennedy, and Breyer; Justice Souter filed a dissenting opinion, in which Chief Justice Rehnquist and Justices Scalia and Thomas joined), suggested that, "Any doubt as to the commanding force of the word, 'shall' . . . is dispelled by this further feature:  the Westfall Act's predecessor, the Federal Drivers Act, provided for court review of 'scope of employment' certifications at the tort plaintiff's behest."  Justice Ginsburg explained in a footnote: "Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may'."  515 U.S. at 432, n. 9 (citations omitted).  This footnote is *dictum* at best, and no reason to dismiss Plaintiffs' complaint in this civil action, especially as the Congressional Defendants bear the burden of persuading the Court to dismiss this action, which action raises, among other important issues, the same "not an unreasonable position" about the composition of the Select Committee recognized but rejected by Judge Kelly on grounds of separation of powers.  The Congressional Defendants in their Memorandum in Support of Motion to Dismiss this action have not even raised the separation of powers issue.

Fourth, in *RNC v. Pelosi*, the Court dismissed the allegations against the House Defendants based on immunity from suit under the Speech and Debate Clause, a defense not raised in this case, and dismissed the Stored Communications Act allegations against Salesforce as moot based on the two co-defendants having narrowed the issues "after discussions between

the Select Committee and Salesforce."  Mem. Op. at 13.  In so holding, the Court acknowledged

the importance of the issues raised, highlighting one of the constitutional claims: "the RNC

identified important First Amendment interests implicated by the subpoena that would have

presented a much different question for the Court had the materials at issue not been narrowed

after discussions between the Select Committee and Salesforce."  *Id*.  No such narrowing of the

subpoenas has occurred in this case.

In short, Plaintiffs have alleged a plausible claim that the Select Committee was not

established according to H. Res. 503 requiring 13 Members, five of which were required to be

appointed in consultation with the Minority Leader.  Accordingly, this claim survives a Motion

to Dismiss for Failure to State a Claim.

## II. THE PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE SELECT COMMITTEE DOES NOT HAVE A VALID LEGISLATIVE PURPOSE AND THUS THE SUBPOENAS ARE OVERLY BROAD AND BEYOND THE PROPER SCOPE OF THE COMMITTEE.

The Select Committee has not met its burden of establishing a valid legislative purpose

to support its subpoenas directed at Plaintiffs.  In the interests of judicial economy, Plaintiffs

adopt the arguments presented by Plaintiff Mark Meadows in his reply brief in the related case

before this Court in *Meadows v. Pelosi*, Case No. 1:21CV3217 (CJN) (ECF No. 38).

As Mr. Meadows argued, Judge Kelly's decision in the *Republican National Committee. v.

Pelosi ("RNC")*, No. 22-659 (D.D.C.), upon which the Select Committee chiefly relies, is not

binding, and respectfully, wrong on legislative purpose.  But more importantly, the D.C. Circuit

has effectively stayed that ruling based on an apparent determination that the RNC is likely to

succeed on the merits of its appeal.  *See* Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123

(D.C. Cir. May 25, 2022).  Neither *RNC*, DDC No. 22-659 nor *RNC*, D.C. Cir. No. 22-5123,

provides a basis to relieve the Select Committee's obligation to substantiate how these Plaintiffs'

phone records would aid Congress in its lawmaking function.

While it is true that House Resolution 503 established the Select Committee "[t]o investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex," H. Res. 503 § 3(1), the Supreme Court reiterated that "'there is no congressional power to expose for the sake of exposure,'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)), and that "Congress may not issue a subpoena for the purpose of 'law enforcement,'" *id.* (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). The Congressional Defendants have not identified any draft legislation that would be better informed by Plaintiffs' phone records, or any conceivable legislative initiative.  By contrast, in the litigation culminating in *Trump v. Mazars*, 140 S. Ct. 2019 (2019), the House was able to identify several pending legislative proposals related to the inquiry, including proposed legislation to require Presidential candidates to disclose tax returns (with President Trump's tax returns being the specific subject of the subpoena). *See generally Trump v. Mazars USA, LLP*, 940 F.3d 710, 727 (D.C. Cir. 2019), vacated and remanded, 140 S. Ct. 2019 (2020). There is no such legislation in this case.

If the legislative purpose is to prevent further attacks on the Capitol (or the Supreme Court[4]), whether motivated by political beliefs on either the left or right that Congress believe are

---

[4] Senator Schumer, standing on the steps of the Supreme Court before pro-abortion activists while the Court was hearing an abortion case, threatened Justices Kavanaugh and Gorsuch by turning to the Court and shouting, "you won't know what hit you" if the Justices ruled against the pro-abortion position**.** *See* National Review, *"Schumer to Gorsuch and Kavanaugh: Nice Little Court Ya Got There, Hate to See Anything Happen to It ..."* (March 5, 2020).  *See* https://www.nationalreview.com/2020/03/chuck-schumer-attack-on-supreme-court-despicable/ Sadly, Senator Schumer's exhortation to violence bore fruit when an attempted assassin of Justice Kavanaugh was recently arrested and the Supreme Court is now barricaded to protect it from agitated pro-abortion protestors due to its reversal of *Roe v. Wade.*

not legitimate, the only remedies to address those harms would be (1) to enact legislation establishing a Ministry of Truth to restrict the content of social media that would motivate such protestors, which would be wholly inimical to the First Amendment, and/or (2) provide better security, which was woefully lacking on January 6th despite intelligence showing that a large crowd was planning to assemble at the Capitol and that violence was possible.   The January 6 hearings heretofore have not focused on the only legitimate legislative purpose:  why was the Capitol vulnerable to attack and how can Congress improve its security to prevent any future attacks.  Fishing through the phone records of the Plaintiffs and investigating their contacts would not further those legislative interests.

As for Plaintiff Alexander, he has already testified for eight hours before the Select Committee and provided the Committee with hundreds of text and email messages that were pertinent to the inquiry.  There is no showing what legislative purpose would be further advanced by obtaining his phone records.  As for the phone records of Plaintiff Christine Torre, there is no legislative purpose for fishing through her phone records or those on her family plan just because she peacefully attended the rallies on January 5 and 6 and volunteered to pass out signs.  Notably, the Committee has not sought the phone records of her son who is **not** on her family plan as Congressional Defendants mistakenly assumed.  *See* Declaration of Christine Torre (Exhibit 1).  While he has pleaded guilty to a misdemeanor for entering the Capitol and leaving voluntarily 15 minutes later well after it was breached, he is expected to be sentenced to probation shortly.  His phone was seized by the FBI when he was arrested and has not been returned.  *Id.*  On the other hand, Committee Members have made abundantly clear that their purpose is to investigate the causes of January 6 for law enforcement purposes, not for legislative purposes.  At a minimum, the Congressional Defendants should explain with some specificity

how each of the Plaintiffs' phone records serves a legislative purpose rather than accepting their *ipse dixit* that the purpose for seeking the phone records is legitimate.

In short, Plaintiffs have stated a plausible claim that the subpoenas for these Plaintiffs' phone records are overly broad and do not further a legitimate legislative purpose.

## III. PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE RELEASE OF THEIR PHONE RECORDS VIOLATE THE FOURTH AMENDMENT.

The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects. It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967). The fact that a third party at least temporarily stores a person's mobile phone data does not alter her expectation of privacy or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018). As Plaintiffs alleged in their Amended Complaint:

78. The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects. It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967).

79. The fact that a third party at least temporarily stores a person's mobile phone data does not alter his expectation or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).
.
80. The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoena untethered from any valid legislative purpose. See *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 196 (1946).

81. If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law. None of the Plaintiffs have provided their consent for Verizon to produce their mobile phone data to the Select Committee. And for the reasons discussed *infra*, the Select Committee's subpoena is invalid.

82. A congressional subpoena must be reasonable. An all-encompassing subpoena for personal, nonofficial documents falls outside the scope of Congress' legitimate legislative power. See *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2040 (2020).

16

83. The Select Committee's subpoena to both Verizon and Mr. Alexander are so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee. *See McPhaul v. United States*, 364 U.S. 372, 381 (1960). The subpoenas to Verizon, in particular, contains no limitations seeking to preserve applicable privileges or prevent violations of constitutional rights.

84. For the Select Committee to subpoena Verizon for all of Plaintiffs' personal mobile phone data over the course of three months is entirely unreasonable. Such a request is so broad both temporally and with respect to the collected data, that the Select Committee exceeds any lawfully authorized purpose.  These subpoenas are overbroad on their face and as applied.

85. As the subpoenas in question exceed the lawfully authorized purpose of the Select Committee, full compliance with such subpoena would violate Plaintiffs' Fourth Amendment protection against unlawful search and seizure. The subpoenas are thus invalid and unenforceable.

In their Memorandum in Support of their Motion to Dismiss, the Congressional

Defendants attempt to distinguish *Carpenter* thusly*:*

> In *Carpenter,* although historical CSLI [cell-site location information] data was in the possession of a third-party telecommunications company, the Court "decline[d] to extend" *Smith* to historical CSLI, "[g]iven the unique nature of cell phone *location* records" and their ability to "achieve[] near perfect surveillance." *Carpenter*, 138 S. Ct. at 2217-18 (emphasis added).  In particular, the Court distinguished historical CSLI from the "limited capabilities of a pen register," which consisted of "telephone call logs [that] reveal little in the way of 'identifying information'." *Id.* at 2219 (citation omitted).

Def. Mem. at 20.

At this stage of this litigation, however, Plaintiffs do not know all of the data that is

contained in the phone records that the Select Committee is seeking.  We do know that, at a

minimum, they contain location information noting the city where the call originated and the city

of the person on the other end of the call or text message, as well as the duration of the

communication, and to that extent, is not unlike the "location records" that were of concern in

*Carpenter*.  There are numerous other data contained in the phone records, including voice

message data that contain additional personal and location information.  *See* Subpoena, Exhibit 1

to Amended Complaint.  The Court should not dismiss this claim until Plaintiffs have had a chance to engage in discovery to examine the full extent and import of the phone data in Verizon's possession that they intend to turn over to the Select Committee.

In any event, the Court need not reach this constitutional issue if it finds that Plaintiffs have made plausible claim that the release of the phone records violate the statutory provisions regulating the use of such records under the Stored Communications Act and 47 U.S.C. 222(c)(1).   If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law.  None of the Plaintiffs have provided their consent for Verizon to produce their mobile phone data to the Select Committee. And for the reasons discussed in the following section  the Select Committee's subpoena is invalid. The subpoenas violate 18 U.S.C. § 1039(b) (making it a crime to transfer 'confidential phone records information . . . without prior authorization from the customer to whom such confidential phone records information relates') and 47 U.S.C. § 222(c)(1) (similar prohibition).

In sum, Plaintiffs have made a plausible claim that the subpoenas violate their Fourth Amendment rights.

## IV. PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM UNDER THE STORED COMMUNICATIONS ACT AND 47 U.S.C. § 222(c)(1).

Plaintiffs seek an injunction, "against the Congressional Defendants for issuing an unlawful and overbroad subpoena to Defendant Verizon for Plaintiffs' telephone records and against Defendant Verizon to enjoin them from turning over the phone records to the Congressional Defendants in violation of the Stored Communications Act and the First and Fourth Amendments."  Amend. Compl., p. 4.  Regarding the Stored Communications Act, the Amended Complaint alleges that, "The subpoenas violate 18 U.S.C. § 1039(b) (making it a crime

to transfer 'confidential phone records information . . . without prior authorization from the customer to whom such confidential phone records information relates') and 47 U.S.C. § 222(c)(1) (similar prohibition [in the Communications Act of 1934, as amended])." *Id.* at ¶86. As will be demonstrated, the disclosure of personal phone records of the plaintiffs violates the Stored Communications Act, and/or in the alternative, violates 47 U.S.C. 222(c)(1), which the Congressional Defendants do not address.

At a minimum, Plaintiffs have alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," the standard for surviving a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs have alleged more than adequate facts, all presumed to be true for purposes of a motion to dismiss, that support their claims that, "The subpoenas violate 18 U.S.C. § 1039(b) (making it a crime to transfer 'confidential phone records information . . . without prior authorization from the customer to whom such confidential phone records information relates') and 47 U.S.C. § 222(c)(1) (similar prohibition)." Amend. Compl., ¶86.

### A. Plaintiffs have alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," under the Stored Communications Act, 18 U.S.C. § 1039(b).

In their Amended Complaint, Plaintiffs alleged the following facts, which are presumed to be true for purposes of the Congressional Defendants' Motion to Dismiss Plaintiffs' claim that Congressional Defendants violated 18 U.S.C. § 1039(b)'s prohibition against transferring "confidential phone record information . . . without prior authorization from the customer to whom such confidential phone record information relates":

70.     Plaintiffs reallege all allegations from paras. 1-69.

71.     The Verizon Subpoenas instruct Verizon to produce subscriber information and mobile phone data associated with the phone number(s) used by the Plaintiffs

and those on their account.

72.    The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, session times, and other metadata.

73.    The mobile phone data requested includes all calls, text messages, and other records of communications associated with that phone number.

74.    This data can be used for historic mobile site analysis.

75.    The requested data arbitrarily covers three full months: November 1, 2020 through January 31, 2021.

76.    Mr. Alexander produced, to the Select Committee, on four separate occasions, content from this mobile phone that was responsive to his October 7, 2021 subpoena. He has been exceedingly compliant with specific requests and described his process to fulfilling general requests.

77.    Mr. Alexander has a reasonable expectation of privacy in his personal mobile phone and data. He remains a private citizen who has never served in government. He has reasonable expectations of privacy and under no required record keeping regulations like government officials or government employees.

78.    The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects.  It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967).

79.    The fact that a third party at least temporarily stores a person's mobile phone data does not alter his expectation or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

80.    The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoena untethered from any valid legislative purpose. See *Oklahoma Press Pub. Co.  v. Walling*, 327 U.S. 186, 196 (1946).

81.    If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law. None of the Plaintiffs have provided their consent for Verizon to produce their mobile phone data to the Select Committee. And for the reasons discussed *infra*, the Select Committee's subpoena is invalid.

82.    A congressional subpoena must be reasonable. An all-encompassing subpoena for personal, nonofficial documents falls outside the scope of Congress' legitimate legislative power.  See *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019,

2040 (2020).

83.    The Select Committee's subpoena to both Verizon and Mr. Alexander are so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee. *See McPhaul v. United States*, 364 U.S. 372, 381 (1960). The subpoenas to Verizon, in particular, contains no limitations seeking to preserve applicable privileges or prevent violations of constitutional rights.

84.    For the Select Committee to subpoena Verizon for all of Plaintiffs' personal mobile phone data over the course of three months is entirely unreasonable. Such a request is so broad both temporally and with respect to the collected data, that the Select Committee exceeds any lawfully authorized purpose. These subpoenas are overbroad on their face and as applied.

Based on the above alleged facts, which are presumed to be true for purposes of the Motion to Dismiss, Plaintiffs' claim that, "The subpoenas violate 18 U.S.C. § 1039(b) (making it a crime to transfer 'confidential phone records information . . . without prior authorization from the customer to whom such confidential phone records information relates')," Amend. Compl., ¶86, the Court should deny Congressional Defendants' Motion to Dismiss.

Section 1039(b) of Title 18, which is title, "PROHIBITION ON SALE OR TRANSFER OF CONFIDENTIAL PHONE RECORDS INFORMATION," provides:

(1) Except as otherwise permitted by applicable law, whoever, in interstate or foreign commerce, knowingly and intentionally sells or transfers, or attempts to sell or transfer, confidential phone records information of a covered entity, without prior authorization from the customer to whom such confidential phone records information relates, or knowing or having reason to know such information was obtained fraudulently, shall be fined under this title, imprisoned not more than 10 years, or both.

(2) For purposes of this subsection, the exceptions specified in section 222(d) of the Communications Act of 1934 shall apply for the use of confidential phone records information by any covered entity, as defined in subsection (h).

Subsection (h)(1), in turn, defines "confidential phone records information" as "information that":

(A)  relates to the quantity, technical configuration, type, destination, location, or amount of use of a service offered by a covered entity, subscribed to by

any customer of that covered entity, and kept by or on behalf of that covered entity solely by virtue of the relationship between that covered entity and the customer;

(B) is made available to a covered entity by a customer solely by virtue of the relationship between that covered entity and the customer; or

(C) is contained in any bill, itemization, or account statement provided to a customer by or on behalf of a covered entity solely by virtue of the relationship between that covered entity and the customer.

Instead of attempting to satisfy their burden of persuasion burden to persuade the Court that the Amended Complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," Congressional Defendants posit that, "The Stored Communications Act contains no restrictions on Congress obtaining non-content records through a Congressional subpoena."  Def. Mem. at 22. The fundamental constitutional flaw of this reasoning is that if there is no express prohibition against Congress for exercising power, then Congress has all unenumerated powers that are not prohibited -- the opposite of what the Tenth Amendment confirms. *Cf. NFIB v. Sebelius*, 567 U.S. 519, 535 (2012) ("If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not violate any of the express prohibitions in the Bill of Rights or elsewhere in the Constitution.").

Congressional Defendants then argue that, "The Act generally allows disclosure of non-content records," citing no authorization in the Act, "although it prohibits (with one exception) voluntary disclosure on non-content records to 'governmental entit[ies].' 18 U.S.C. § 2702(a)(3), (c)(4).  The definition of the term 'government entity,' as used in the Act, does not include Congress.  *Id.* §§ 6, 2711(4).  And the Act expressly permits disclosure to "any person other than a governmental entity.' *Id*. § 2702(c)(6)."  Def. Mem. at 22.

The common-sense definition of "government entity" does include the Congress and its committees, yet the Congressional Defendants argue they are not bound by the prohibition against non-authorized-by-the-customer release of customer records because each of the Congressional Defendants is a "person other than a government entity" exempt from the prohibition by 18 U.S.C. 2702(b)(6). Def. Mem. at 24.

Congressional Defendants cite the U.S. Supreme Court's distinguishable decision in *Hubbard v. United States*, 514 U.S. 695 (1995), in support of their argument that the Stored Communications Act's "definition of 'government entity' and the definition contained in Section 6 [of Title 18] make plain that the term 'government entity' does not apply to Congress. There is nothing in the Act that even suggests, let alone 'shows,' that Congress intended to include itself in the definition." Def. Mem. at 23-24.

In the first place, it is not "plain" that the definition of "government entity" does not apply to Congress. As one commentator put it:

> My point here is not that Congress's ability to obtain content information is clear; rather, my point is that the prohibition *against* the use of congressional process is ambiguous. Textual uncertainty exists because Congress treats itself differently than other government entities, often imposing limits on others' investigative activities that it does not apply to itself, arguably including the prohibitions in § 2702.

Aaron R. Cooper, *Congressional Surveillance*, 70 Am. U. L. Rev. 1799, 1833 (2021).

Fortunately, the Supreme Court provided this guidance for ascertaining whether the Congressional Defendants have the power they claim, regardless of whether Congress has expressed an intent "to include itself in the definition" that would forbid the Congressional Defendants from exercising the power at issue: "The question is not what power the Federal Government ought to have but what powers in fact have been given by

the people." *New York v. United States*, 505 U.S at 157 (internal citation omitted); *cf.*
*United States v. Heth*, 7 U.S. (3 Cranch) 399, 409 (1806) ("If it be necessary that the
Court should make an election between these words in order to complete the sense [of a
statute], its choice will be immediately determined by recurring to two well-known rules
of construction, *viz.,* that it ought to be consistent with the suggestions of natural justice
and that the words should be taken most strongly *'contra proferentem'.");* *Mesa Air*
*Group, Inc. v. Department of Transp*., 87 F.3d 498, 506 (D.C. Cir. 1996) *("Contra*
*proferentum* is a basic principle of contract law which provides that '[i]n choosing among
the reasonable meanings of a promise or agreement or a term thereof, that meaning is
generally preferred which operates against the party who supplies the words or from
whom a writing otherwise proceeds.'  Restatement (Second) of Contracts, § 206
(1979)")*.  Accordingly, any ambiguity about whether the Congress has exempt itself
from the definition of "government entity" should be construed against Congress and in
favor of the individual whose confidential phone records are being subpoenaed.

Congressional Defendants acknowledge that *Hubbard v. United States*, 514 U.S.
695 (1995), which involved "the applicability of 18 U.S.C. § 1001, forbidding making
false statements to 'any department or agency of the United States,' to the Judicial
Branch," Def. Mem. at 23, was effectively overruled by a subsequent Act of Congress:
"After the ruling in Hubbard, Congress amended the statute at issue, 18 U.S.C. § 1001.
*See* False Statements Accountability Act of 1996, Pub. L. No. 104-292 §2."  Def. Mem.
at 23, fn. 29.  Congress amended 18 U.S.C. § 1001 in the aftermath of *Hubbard v. United*
*States*  to make it a crime for anyone "within the jurisdiction of the executive, legislative,
or judicial branch of the Government" to do any of the following fraudulent acts

24

"knowingly and willfully":

> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

18 U.S.C. § 1001(a).  Subsection 1001(b) provides exceptions for certain Judicial Branch activities, and Subsection 1001(c), instead of making exceptions, provides that, "within the jurisdiction of the legislative branch, subsection (a) shall only apply to – (1) administrative matters, . . . ; or (b) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate."

In short, where there is exposure to criminal liability for making a false statement to a government agency, the Courts require Congress to speak clearly that the legislative branch is covered by the proscription.  Similarly, when Congress purports to exempt itself from the definition of "government entity" in the Stored Communications Act, it should also make it clear that it is **not** a "government entity" despite the common sense meaning of that term that it is. The Stored Communications Act has been on the books since 1986.  If Congress wished to include itself in the Act's "governmental entity" exceptions to the general prohibition against disclosing information, it certainly could have done so as it did in the context of 18 U.S.C. §1001.

### B. Plaintiffs have alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," under the Communications Act of 1934, as amended, 47 U.S.C. § 222(c)(1).

The same facts alleged in Paragraphs 70-84 of the Amended Complaint that state a

claim that Congressional Defendants have violated 18 U.S.C. § 1039(B), also preclude dismissal of Plaintiff's claim that Congressional Defendants' have violated Section 222(c)(1) of the Communications Act of 1934, as amended.  47 U.S.C. § 222(c)(1).  Specifically, based on the facts alleged in paragraphs 71-84 (quoted above), which are presumed to be true for purposes of the Motion to Dismiss, Plaintiffs' claim in Paragraph 86 that, "The subpoenas violate . . . 47 U.S.C. § 222(c)(1)'s prohibition against "disclos[ing] or permit[ting] access to individually identifiable customer proprietary network information" without "approval of the customer" presents to this Court with "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'."  Def. Mem. at 9-10 (citations omitted).

Section 222(c)(1) of the Communications Act of 1934, as amended, provides:  "**PRIVACY REQUIREMENTS FOR TELECOMMUNICATIONS CARRIERS[:]**  Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the  telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories."  47 U.S.C. § 222(c)(1).

In addition to the arguments in opposition to dismissal presented in the previous section, Plaintiffs would point out that the prohibition in 47 U.S.C. § 222(c)(1) against "disclos[ing] or permit[ting] access to individually identifiable customer proprietary network information" without "authorization from the customer" is an independent statutory prohibition that the Congressional Defendants have not even briefed in their Memorandum in Support of Their Motion to Dismiss.

Accordingly, even if the Court were to accept the Congressional Defendants' argument that it should dismiss Plaintiffs' claim that Congressional Defendants have violated 18 U.S.C. § 1039(b), the Congressional Defendants did not even attempt to satisfy their burden to persuade the Court that the Plaintiffs' claim that Congressional Defendants have violated 47 U.S.C. § 222(c)(1)'s prohibition should be dismissed.  Accordingly, Plaintiffs' claim that Congressional Defendants have violated 47 U.S.C. § 222(c)(1) cannot be dismissed.

## V.  PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE SUBPOENAS FOR THEIR PHONE RECORDS VIOLATE THE FIRST AMENDMENT.

By seeking information about Plaintiffs' personal and professional communications, the Select Committee is improperly attempting to obtain information about Plaintiffs' free speech and association activities that are protected by the First Amendment.   The Select Committee cannot demonstrate a compelling justification that would justify this intrusion. *See e.g., NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963).

In his Amended Complaint, Plaintiff Alexander alleged the First Amendment harms he suffered from the subpoena for his phone records:

95. Some colleagues, business prospects, former clients, and associates have not spoken to Mr. Alexander or ceased communication with him because of public reports that his phone records would be obtained. This has harmed his ability to effectively exercise his First Amendment rights and conduct his business.

96. Mr. Alexander used his personal mobile device to engage in protected advocacy and other speech, including privileged speech with his attorney(s) and clergy. Mr. Alexander, himself, is also a Christian minister and engaged in counseling, prayers, and ministerial duties using his mobile phone.

97.  All of these associational and expressive activities are protected by the First Amendment.  Recall, Alexander runs an organization and his membership is constitutionally protected.  *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *Black Panther Party v. Smith*, 661 F.2d  1243, 1267 (D.C. Cir. 1981); *Am. Fed'n of Lab.*

27

*& Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 179
(D.C. Cir. 2003); *NAACP v. Alabama*, 357 U.S. 440 (1958).

98. The information sought from Verizon by the Select Committee would also
intrude on Plaintiffs; rights to freedom of association as protected by the First
Amendment of the U.S. Constitution. *See, e.g.*, *NAACP v. Alabama*, 357 U.S.
449, 462 (1958).  Volunteers, such as Plaintiff Torre, would be discouraged from
participating in future efforts with Mr. Alexander if their phone records (including
those on their family plan) can be subpoenaed so arbitrarily and their private
phone contacts exposed to government scrutiny and harassment.

Plaintiff Alexander's cellular telephone and text message "call-data" records are the

modern-day equivalent of a membership list in that, in addition to disclosing information about

personal communications, it may provide records of calls and messaging that are not pertinent to the

Committee's investigation, and thus overbroad in its scope.  As for Plaintiff Torre, obtaining her phone

records and those of her family on her plan is highly intrusive, chills her association rights, as well as

being beyond the scope of the Committee's legislative interest.

In that regard, the Danelle Brian, the Chair of the Project on Government Oversight

(POGO), submitted a letter to Committee Chairman Thompson on October 5, 2021, expressing

grave concerns about the subpoenas' impact on First Amendment freedoms, stating in part:

> Indeed, we at POGO were the subject of overreaching subpoena in the
> 1990s, including subpoena for my home phone records, in an effort to identify
> whistleblowers who had exposed the oil and gas industry's fraud in underpaying
> royalties.
>
> If similar efforts to target and malign government critics or marginalized
> communities are attempted in the future, it is vital they cannot weaponize the vast
> array of private digital information that exists in modern society, or collect such
> information to harm or chill expression by religious minorities, political
> dissidents, or whistleblowers. The actions the committee takes in the coming
> weeks may set important precedent for how congressional demands for records
> are used going forward. (footnote omitted).[5]

---

[5] https://www.pogo.org/letter/2021/10/letter-to-january-6-committee-supporting-careful-use-of-subpoena-authority/.

Even where pertinent records are sought, before a legislative committee proceeds "in such a manner will substantially intrude upon and severely curtail or inhibit constitutionally protected activities or seriously interfere with similarly protected associational rights" it must lay an "adequate foundation for inquiry" and demonstrate a "compelling and subordinating governmental interest."  *Gibson v. Florida Investigation Committee,* 372 U.S. 539, 540 (1963).  For example, what possible information could the Committee obtain from Plaintiff Torre's phone records at this stage of its investigation that would serve its legislative interest?

In sum, Plaintiffs have sufficiently alleged facts that the phone records sought are not pertinent or that the Select Committing has not demonstrated a "compelling and subordinating government interest," and their production would violate their First Amendment rights. Accordingly, this Count should not be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should deny Congressional Defendants' Motion to Dismiss Plaintiffs' Amended Complaint because Plaintiffs have alleged facts that plausibly state a claim upon which relief can be granted under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Dated: June 28, 2022

/*s/Paul D. Kamenar*
Paul D. Kamenar, Esq.
D.C. Bar 914200
1629 K Street, N.W., Suite 300
Washington, D.C. 20006
(301) 257-9435
paul.kamenar@gmail.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 28, 2022, I caused the foregoing Plaintiffs' Memorandum in Opposition to Congressional Defendants' Moton to Dismiss Plaintiffs' Amended Complaint, Exhibit 1 thereto, and Proposed Order to be filed via the CM/ECF system for the U.S. District Court for the District of Columbia, which I understand caused a copy to be served on all registered parties.

Dated: June 28, 2022                    Respectfully submitted,

                                        */s/ Paul D. Kamenar*
                                        Paul D. Kamenar
                                        *Counsel for Plaintiffs*